

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| DAVID AESOPH, | * | CIV 07-03015 |
| | * | |
| Petitioner, | * | |
| | * | |
| -vs- | * | |
| | * | REPORT and RECOMMENDATION |
| | * | |
| DOUGLAS WEBER, | * | |
| Warden, SD State Penitentiary, | * | |
| | * | |
| Respondent. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

     Petitioner, David George Aesoph, an inmate at the South Dakota State Penitentiary, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) and Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 13). The Respondent has filed its Answer (Doc. 25) along with an accompanying brief and attachments . Petitioner filed a Reply to the Respondent's Answer (Doc. 34). Petitioner also filed supplemental authority (Doc. 35 and 36). Respondent filed supplemental authority and response to Petitioner's supplemental authority (Docs. 37 and 38). Respondent also filed the pertinent original state court records, along with transcripts of Petitioner's jury trial and the state habeas evidentiary hearing.

## JURISDICTION

    The pending matter was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), Judge Piersol's Standing Order dated November 29, 2006 and Judge Kornmann's Order dated June 11, 2007.

## FACTUAL BACKGROUND[1]

Tania and David Aesoph married in 1975. They lived on a farm outside Highmore, South Dakota. In February, 1994, Tania left David, got a part-time job as a nurse, and sought the advice and assistance of Sioux Falls divorce attorney Lee Burd. Tania alleged David abused her mentally, physically and verbally. She sought the divorce on the grounds of extreme cruelty. At the time of the 1994 divorce proceedings, Tania indicated to several people that she feared David would kill her and make her death look like an accident. Indeed, David told several people he wanted to kill Tania. Tania eventually withdrew the divorce petition and returned to the farm. She did, however, continue her part-time nursing job at the Faulkton Hospital/Clinic.

By 1999, Tania again decided to divorce David. She bought herself her own car in October, 1999.[2] She began to secretly move personal belongings to her friend's home. On November 7, 1999, Tania and the youngest of her five children (JA) left the farm while David slept and moved to an apartment in Faulkton, South Dakota. On November 16, 1999, Tania contacted Lee Burd to discuss re-initiating divorce proceedings against David. Burd would later testify that Tania seemed like a different person in 1999–"she was sitting up right in her chair. She was–she had a lot more confidence . . ." JT at 793.

David obtained two life insurance policies on Tania's life. Both policies were dated after Tania initiated the first divorce proceeding. Both were payable to David, and totaled 1.7 million dollars in the event Tania died by accidental means. David obtained the second policy when he told

---

[1]The facts which are most pertinent to the issues raised by Petitioner are summarized and are gathered from the State court criminal file, CR 99-26, Sixth Judicial Circuit, Hyde County, South Dakota, from the published opinion disposing of Petitioner's direct appeal, *State v. Aesoph*, 647 N.W.2d 743 (S.D. 2002), and from the various transcripts and exhibits contained in both the original criminal and habeas files which have been thoroughly reviewed by the Court. References to the transcript of the jury trial will be by "JT" followed by the appropriate page number. References to the settled record of the state criminal file will be by "SR" followed by the appropriate page number. References to transcripts of various other hearings will be by the specific hearing, date and page number.

[2]An employee from the car dealership testified at trial that Tania called the day after purchasing the vehicle in a panic, "frantic . . . bawling, screaming and hollering" claiming her husband would "kill her because she spent some money" even though the check was drawn on Tania's separate account.

his friend and insurance agent (Mike Newton) that he wanted to cancel the first one because the premiums were becoming too expensive. David continued to pay the premiums, however, on both policies and likewise added an accidental death rider to the first policy unbeknownst to Newton. David sent the premiums and purchased the accidental death rider directly from the insurance company, and Newton was unaware until after Tania's death that the first policy remained in effect or that the accidental death rider had been added. On November 12, 1999, David called Newton and told him about the impending divorce. David told Newton, "I'm going to kill the bitch, you know I can do it," and "remember she was the one that wanted the life insurance." JT 934. David asked Newton if Newton knew of any way he (David) could transfer the farm land into his son's name. Newton referred David to an attorney.[3] After Newton learned of Tania's death he visited David. Newton explained he would be unable to attend Tania's rosary service because of another commitment. David said "I don't give a shit, she deserved to die." JT 959.

Tania died on November 18, 1999. On that morning, she drove to the farm to meet David because they had a 9:30 a.m. appointment in town with a Court Services officer regarding their sons' juvenile case. Tania and David rode into town together in David's pickup. After the meeting, David drove Tania to make a deposit at the bank. Next, David and Tania met with an attorney in Highmore regarding the divorce.[4] The Hyde County Sheriff (Mike Volek) happened to observe David and Tania in David's pickup, headed toward the family farm, at about 11:10 a.m. Their oldest daughter, Rebecca, was at the time a foreign exchange student in Italy. They had previously arranged to call her and did so from 11:43 a.m. until 11:55 a.m. Tania had an appointment to meet with her Priest (Father Randy Philips) at 1:00 p.m. at the parish office in Faulkton. She missed the appointment. David called an implement dealer in Miller, South Dakota at 1:08 p.m. inquiring about a radiator cap he needed for his farm equipment. He arrived at the dealership an hour later to purchase the radiator cap. At 3:01 p.m., David called the former Hyde County Sheriff (Martin Wortman) to inform him that Tania had fallen down the stairs and was dead.

---

[3]David's phone records indicate he'd been in contact with another attorney (not the divorce attorney) more than thirteen times in the week preceding Tania's death.

[4]Tania had not told David that she had again retained Lee Burd to represent her. David believed, until after Tania's death, that the same attorney (hired by him) would represent both of them in the divorce.

David called the current Hyde County Sheriff (Volek) at 3:16 p.m. and also informed him that Tania was dead. Volek was the first to arrive at the farm at 3:55 p.m.

When Volek arrived, David was coming out of the bathroom. David told Volek he'd moved Tania's body because he did not want the kids to see her. David was washing blood off his hands. Volek found both the washer and dryer running. David's work coat was inside the washer, and a pair of jeans, mismatched work gloves, underwear, shirts, socks and a towel were found in the dryer. When Volek turned the washing machine off and asked David who had started it, David turned it back on and asserted someone else must have started it.

Several law enforcement agents (DCI Agents Jerry Lindberg, Brian Zeeb and Mike Braley); (State Crime Lab personnel Mike Luze, Rex Riis and Christine Reitsma) all arrived within a few hours. Two of David's adult children also arrived and visited with David briefly about handling the farm chores. The DCI Agents interviewed David three times between 5:25 p.m. and 11:16 p.m. on the evening of November 18. The interviews occurred in the dining room of the Aesoph home. The first interview lasted thirteen minutes, the second forty-five minutes, and the third sixty minutes. David was not accompanied by his attorney during the interviews, nor did any of the law enforcement agents advise him of his *Miranda* rights. The interviews were taped using a portable tape recorder, but were not video taped. The interviews have been transcribed and were marked as Trial EX 59. The audio tapes were also marked as trial exhibits. David's version of events changed somewhat throughout the course of the three interviews. In the first interview David claimed he'd briefly helped Tania load some Christmas decorations into her car after the phone call to their daughter, then left to drive to Miller to get the radiator cap. He was gone for approximately two hours, returned and worked on his tractor for a period of time, and eventually discovered his wife's body in the house at the bottom of the stairs. David explained that Tania's "neck was twisted under her and maybe kinda leaning back a little bit against the, sidewall ya know. I don't know how to describe it. Her legs were kinda flopped over her ya know to the front." During the second interview, David indicated Tania sometimes said she felt dizzy, but did not have any medical problems that he knew of and was not being treated for blood pressure or any other medical problems. He guessed she tripped over some Christmas decorations that were sitting on the steps. He claimed he had never laid a hand on Tania. He said he was "pretty sure" that it was not him that hit her. He told the agents there was some blood on the left railing, but he'd wiped it off because

4

he thought the kids were coming home. The third interview was more confrontational than the first two. Agent Braley flatly accused David of not telling the truth. Braley told David the physical evidence made David's story "suck." Braley suggested there was physical evidence of a struggle, but perhaps what happened was an accident. During the second and third interview, David made the following references to an attorney:

- "If it goes that far, I suppose you're gonna want me to have an attorney, aren't ya?"[5]
- "If you are accusing me here, maybe I should call my lawyer."
- "Don't you think I should talk to the attorney, ya know?"
- "You're makin sense, Mike. I'm just. I'm afraid to admit to anything. Maybe I should have an attorney. I'm scared to death.
- "I really should call Jeff my attorney. I don't know. I really can't. I maybe can add a little bit to it, but I just, I can't."

After this last reference to the attorney, Braley urged David to "add something to it" and David finally admitted there was a "little" pushing and shoving out in the garage before Tania fell down the stairs. He said she might have tripped outside when he pushed her. They argued because he was too harsh on the kids. He was in the house changing clothes when he heard a racket. He "freaked" when he saw her at the bottom of the stairs. He left her there and went to Miller for the radiator cap. Finally, David told Braley he was coming out of the office putting his pants on when Tania fell down the stairs, probably thinking David was going to harm her. He did not go down the stairs to see if she needed help, but instead went to Miller for the radiator cap. When he returned he worked on his grinder for a while, then decided to call the Sheriff because he did not want the kids to see Tania. After this version, Braley specifically asked David if he wanted an attorney. David said "I want one eventually." David also agreed with Braley that the agents had never told him he could not have an attorney. When Braley again asked David if he wanted an attorney David said "I can answer on my own."

---

[5]The Petitioner's explained in his brief to the South Dakota Supreme Court that this excerpt does not appear in the transcript (EX 59) which was admitted into evidence at trial. It was also redacted from the audio tapes. It apparently does appear on the transcript which was admitted into evidence as EX 3 during the suppression hearing, although that transcript has not been located in the state court records which have been forwarded to this court for review. For purposes of this proceeding, however, it is assumed the statement was made.

The phone rang during the third interview. Agent Braley said "No, you stay right there, Brian, would you get that?" After determining it was not the daughter from Rome calling but rather was the neighbor, Agent Zeeb told the caller David would call back later. During the third interview when Braley was urging David to be more forthcoming, David said "whatever I say, I'm convicted." Braley assured David he would not go to jail until an interim period of time passed for the court system to sort things out. Braley explained the State's Attorney would decide whether David would be taken into custody and whether he would be allowed out on bond. David was arrested at approximately midnight at the direction of the State's Attorney (Axtmann). He was released the next day on $100,000 bond, but the bond was later revoked when David failed to abide by the conditions of his release.

The State's pathologists determined the cause of Tania's death was manual strangulation and blunt force trauma, injuries which were inconsistent with a fall down a flight of carpeted stairs. Her body also showed signs of other injuries such as a black eye, broken ribs, skull fractures and other cuts and bruises. Crime scene investigators later discovered scuff marks on the garage floor at the Aesoph farm, blood spatter which matched Tania's on the lower inside panel of the garage door, and a clump of Tania's hair under a car which was parked in the garage. A tiny, pinpoint sized clump of tissue (which the State tested for DNA and did not match David) was found under one of Tania's fingernails.

David was indicted for First Degree Murder and lesser included offenses. The trial was moved from Hyde to Lyman County because of pretrial publicity. Jury selection lasted for the better part of two days. When it became clear that it would not be possible to seat fifty six potential petit jurors from the two panels which were initially summoned, the Lyman County Deputy Sheriff recruited twenty additional jurors before the end of the first day of jury selection. JT 159. The Sheriff recruited twenty more additional jurors by the next morning. The Deputy was questioned in chambers at the end of the first day about how he went about finding the extra jurors:

| | |
|---|---|
| JUDGE: | Sure. Now Mr. Sveen, you wanted to inquire, or Mr. Rasmussen, one of you about how the 10–20 jurors were selected and how they're going to select an additional 20. |
| DEPUTY: | I got the first 20. He gets the . . . |
| JUDGE: | Tell us your name. |

DEPUTY:      Rob Parker, Deputy Sheriff.

JUDGE:       Do you want him sworn?

ATTY:        I don't think he needs to be sworn.

DEPUTY:      We picked 20. We went town to town so we could get 3 people per
             town. Vivian we called some people that were home. If they
             answered they got called. We called a couple of businesses.
             Whoever first picked up the phone they were coming in. Then.....

ATTY:        So you did this by phone then?

DEPUTY:      Yep.

ATTY:        What towns?

DEPUTY:      Oacoma, Reliance, Kennebec, Presho, and Vivian.

ATTY:        Did you attempt to contact Lower Brule?

DEPUTY:      No, we did not.

ATTY:        Is there a reason?

DEPUTY:      Due to how many on the list didn't come in anyway.

ATTY:        Okay.

ATTY:        Sheriff, you're going to be in charge tomorrow, I understand. What's your
             plan as far as this goes?

SHERIFF:     I don't know. The only other way I know how to do it is to get the excess
             names from –from the Clerk of Courts.

JUDGE:       And that's –that's not within the realms of what we're going to do.
             I'm going to have you pick them. The Clerk doesn't have anybody
             left on a panel.

ATTY:        I guess it would be our position, Your Honor, that–that some
             attempt–and I realize we have problems with people in Lower Brule,
             and I understand this isn't the first time.

JUDGE:       I don't disagree. Sheriff, see if you can get anybody from up on the
             Rez.

7

ATTY:      Can I ask one question?

JUDGE:     Sure.

ATTY:      How did you determine who you would call in the phone book?

DEPUTY:    We started at the top, letter A every third person down was getting
           called.  If they weren't home we went to the next three.  That was
           time consuming so we went down, I bet they're home.  We called
           them.  They were.  Some of them weren't some of them were.

ATTY:      People you knew?

DEPUTY:    People we knew that wouldn't be working and didn't have —couple we
           called had daycares going on.

ATTY:      Okay.

JUDGE:     Well I think the $64 question did you call anybody that you thought
           was pro-law enforcement?

DEPUTY:    Half the list I'd say probably not.

JUDGE:     Okay.

DEPUTY:    There's a couple of them definitely not pro-law enforcement after we
           talked to them.  I guess the majority of them called the clerks going,
           "Now is this real?"

JUDGE:     All right.  That's the concern that people have.  This isn't a trial in the
           county where the sheriff of the county is doing the calling so I think
           it's pretty random.  Anything else you want to ask?

ATTY:      I don't think so.

JUDGE:     Mr. Sveen?

ATTY:      No.

JUDGE:     All right.  Sheriff, we need 20 more in the morning.

SHERIFF:   20 more in the morning, okay.

\*\*\*

8

| SHERIFF: | Is there any method, recommendation, how to pick these people? |
|---|---|
| JUDGE: | Do you object to the way that this has been done so far, Mr. Sveen or Mr. Rasmussen? |
| ATTY: | We probably–for the record we would probably object on the basis that there's been no attempt from anybody from Lyman County–I mean from Lower Brule or the reservation. |
| JUDGE: | Well, we'll rectify that. |
| ATTY: | Just trying to preserve our record, Your Honor. |
| JUDGE: | I understand. And I'm glad you did that so the sheriff will go up there or call up there and fix that. |
| SHERIFF: | Sure. |

*See* JT 238-45. Two Native American males were apparently stricken by the State during the strike down process. JT 404. The sixteen petit jurors who were seated to hear the case included two (Middletent and Eagle Thunder) who had Native American surnames. JT 414. One of those (Middletent) was ultimately an alternate juror who was excused from deliberations. JT 2779. Eagle Thunder served as a petit juror and deliberated through the verdict.

During the trial, several witnesses were allowed to testify about Tania's statements to them that she feared David would kill her or have her killed (Father Anderson, JT 550; Jan Martinmaas, Tania's friend, JT 574; Agent Juhala, JT 583; Dr. Kuglitsch, Tania's co-worker, JT 647; Janine Rathert, the salesperson at Harr Motors where Tania bought her car in October, 1999, JT 671; Carol Baloun, Tania's friend, JT 683). Witnesses were allowed to testify that Tania told them if David killed her, he would make it look like an accident (Robynn Johnson, Tania's sister, JT 563; Agent Juhala, JT 583; Lee Burd, Tania's divorce attorney, JT 799-800; EX 6). Witnesses were also allowed to testify that Tania felt threatened by David (Vicky Gardner, Tania's cousin, JT 659; Lee Burd, divorce attorney, JT 802). Witnesses also testified Tania told them David verbally abused her and shoved her around (Dr. Kuglitsch, JT 647; Vicky Gardner, cousin, JT 659; Janine Rathert, car salesperson, JT 672; Wilma Luce, Tania's co-worker and friend, JT 710). Two of Tania's co-

workers (Jan Melius and Darlys Holm) were allowed to testify that Tania told them she would not walk in front of a vehicle if David was driving it. JT 736, 751.

The trial lasted from September 18, 2000 until October 5, 2000. Sixty-six witnesses testified, including lay witnesses, law enforcement personnel, and experts for both the State and the defense. David Aesoph also testified in his own defense. The prosecution asserted that Tania's injuries were inconsistent with a fall down the stairs. In support of its assertion, the State introduced evidence including photos of Tania's injuries, along with the testimony of the various witnesses who viewed her injuries. Among the witnesses who testified were Dr. Brad Randall, Dr. Saami Shaibani, and Dr. Maria Alandy (rebuttal witness).

Dr. Randall (forensic pathologist) performed the autopsy on Tania the day after she died (November 19, 1999). He observed bruising around her face and upper chest. Her panty hose were torn in the knees and left ankle. Her knees and left ankle were bruised and scraped. Her left eye was blackened and she had a large bruise on her left cheek. She had a "through and through" laceration on her left lip. She had a large impact type abrasion on the left side of her skull where the skin had been scraped away. She had a similar but smaller abrasion on the right side of her skull. She had petechiae hemorrhages on her right temple and the lower surface of her right eyelid. Her neck was bruised along the left jaw line, and two bruises were present on the neck itself. The voice box was bruised on the left side of the neck and on the right. These injuries indicated to Dr. Randall that Tania's injuries were consistent with manual strangulation. Dr. Randall also observed bruising on Tania's left collar bone. She had internal injuries consisting of bruising along the rib cage and four or five fractured ribs. She had abrasions on her knees, and the left ankle had an abrasion on the top. She also had bruising on the back of her right hand. The bruise to the back of the right hand caused Dr. Randall to suspect it was a defensive injury. Dr. Randall examined Tania's head and found an internal bruise to the inside of the scalp that extended from the left side of the head partially across to the back of the head, and underlying the bruise on the right side of the head was another area of bruising under the scalp. The injury to both sides of the head suggested impact with a hard object such as a hard floor or wall, followed by a blow to the head. Tania sustained skull fractures on both sides of her head underneath the bruises. Dr. Randall described them as being located above and

10

behind her ears. She also had some bruising around her left kidney. Dr. Randall found no underlying natural disease or other cause for her death. She did not have a broken neck. There was no indication that anything obstructed her airway. Dr. Randall believed it would be "very unlikely" that Tania could have died from positional asphyxia from falling down the stairs in her home. Dr. Randall opined Tania's death could not have been caused by a fall down a flight of carpeted stairs. He based his opinion on the number and diffuse location of her injuries. Dr. Randall opined Tania's death was caused by manual strangulation and blunt head trauma.

Dr. Saami Shaibani testified as an expert witness for the State. He claimed he was a clinical professor at Temple University and that he had four physics degrees from Oxford University in England. His specialty was "injury mechanism analysis" which combines the study of physics, trauma and engineering to determine whether an injury could have been caused by the circumstances involved. He claimed to be a licensed professional engineer "all over the world." He explained he does not charge a fee to testify as a prosecution or defense expert in criminal cases because he considers it to be a community service. Dr. Shaibani testified he "couldn't imagine any scenario for that staircase in the Aesoph residence that anyone could have died." Shaibani read directly from the transcript of David's interviews to describe the position in which David claimed he'd found Tania's body at the bottom of the stairs. Shaibani testified that even though it was unknown whether Tania fell forward, backward, or sideways, "whichever way you slice it" it was "impossible" and "not consistent with the law of physics" for Tania to have fallen down the stairs and landed in the position described by David. He also opined Tania's combination of injuries cannot result from a fall down a staircase.

Wendy Magee is an employee of Cellmark Diagnostics in Germantown, Maryland. She tested several items of evidence in this case and compared them to known DNA samples. Magee tested hair which was found on the floor of the Aesoph garage which matched Tania's DNA. Blood found on the garage door also matched Tania's DNA. Magee testified about "particle number 68" which was the tiny piece of tissue found under one of Tania's fingernails. It was described to Magee as a "possible skin tissue." Magee described the sample as the "size of a speck." It did not match either Tania or David's DNA. Magee's DNA testing revealed, however that the source of the tissue

was male. Later, a number of other known DNA samples were sent to her for comparison, but none of them matched the sample either. On cross-examination Magee explained she only used half of the extracted DNA sample, and sent the other half back to the South Dakota Forensic Lab.[6] Magee's notes regarding the remainder of the sample were copied and sent to the defense expert. After the trial, but before Judge Gors ruled on the defense Motion for New Trial, the remainder of the sample was sent to a defense expert (Henry Travers) for testing. Travers is a pathologist employed by Physician's Laboratory in Sioux Falls. He submitted an affidavit (SR 692-93). Dr. Travers explained the remainder of the sample was sent to the University of Iowa at his request and examined by electron microscopy. No actual skin was contained in the vial, but keratin, which is found in the outer layer of skin, did remain in the vial. Dr. Travers concluded that the original particle was "more probably than not" skin tissue. Dr. Travers also explained that the previous DNA testing completely destroyed the actual particle described as "skin-like tissue" by the South Dakota Forensic Lab, but if certain steps had been taken before DNA testing, electron microscopy could have revealed with certainty whether the particle was skin tissue.

Rex Riis, is the Lab Director is the South Dakota State Forensic Laboratory. He also testified about "particle number 68" and referred to it as "skin-like tissue." TT 1795. At trial, Riis testified he could not determine whether the DNA results on the tissue were caused by sweat or saliva, or whether the tissue was skin at all. JT 1920.

Dr. Maria Alandy testified on rebuttal for the State. JT 2583. She is a forensic pathologist currently residing in Eureka, South Dakota who was formerly the medical examiner in New York, New York. She agreed Tania's cause of death was blunt force trauma and manual strangulation. She also believed Tania's combination of injuries were inconsistent with a fall down carpeted stairs. She stated it was "quite impossible" to account for Tania's injuries because of a fall. JT 2605.

---

[6]The skin-like tissue had been the subject of pre-trial discovery requests. Specifically, the defense requested the sample be divided in half before DNA testing. SR 701-03. The State replied that "[b]ecause of the small quantity, Cellmark had to consume the entire skin sample in order to obtain enough extract to test." SR 699. The State offered to allow the defense to retest remaining extract, if any. *Id.*

12

David Aesoph testified in his own defense. He testified that on November 18, 1999, Tania came to the farm before the meeting with Dan Peterson. They rode to town together in David's pickup. After the meeting with Peterson, David waited in the pickup while Tania went to the bank. Then they met with the divorce lawyer (Voorhees). They returned to the farm and called their daughter in Rome. After the phone call, David changed clothes and made himself some lunch while Tania loaded Christmas decorations into her car. She asked him to help her load some things, and he did. He observed a can full of decorations at the top of the stairs. He admitted they got into an argument about the children and that he "pushed her around" in the garage. JT 2337. She went back into the house to get more things and he went out to get something out of his pickup when he heard Tania call for him. He looked back toward the garage and saw her lying behind the car. He helped her get up. She said she was feeling dizzy and "oozy." She sat on the rug inside the mud room and he sat on a five gallon bucket and they talked until she felt better. JT 2340. He retrieved her shoes from the garage for her, and hung her coat on a chair in the house. She said she was feeling better so he went outside and worked on his tractor. JT 2343. When he came in from working on the tractor, he did not see Tania. JT 2344. He came in the house and called Vogel's, then drove to Miller to get the radiator cap. He did not see Tania before he left. *Id.* He drove to the implement dealer in Miller to get a new radiator cap. When he returned to the farm, he did not immediately go to the house. He worked on the tractor for a while before he noticed Tania's car was still there. JT 2349. He returned to the house and yelled for her but she did not answer. *Id.* He looked around in the house and saw Christmas decorations on the steps, then saw Tania laying at the bottom of the stairs. JT 2351. He went to the bottom of the steps and got her head onto his lap and turned to the side and blood came out onto his coat. She looked dead. JT 2352. He laid her head back down. He didn't know what to do. He tried to position her so she would not bleed all over the carpet. He took hold of her legs and her dress and pulled her around to the south of the stairwell so the kids would not see her when they got home. She was on her back. He got a blanket and covered her up. He got blood all over his hands and coat. He walked upstairs and sat down for a while. He tried to call the Sheriff but could not get a hold of him, so he called Marty Wortman. While he was waiting for the Sheriff to arrive, he threw his coat in the washer and cleaned his hands in the bathroom. He used a rag to clean blood off the handrail. He denied washing his jeans or his shirt. David's explanation for the difference between the version of events he recounted during his interview and

13

the version of events he recounted during his trial testimony was that during the interview he "was pretty much telling them what they want[ed] to hear." JT 2438.

Two experts testified for the defense: Peter Barnett and Dr. Thomas Bennett. Peter Barnett is a consulting criminalist from Los Angeles, California. Thomas Bennett is a forensic pathologist from Wyoming. Barnett testified about the physical evidence at the Aesoph farm. He opined there is no way to tell when Tania's shoes were scuffed. Mr. Barnett also explained the theory offered by the State's expert for the blood spatter on the Aesoph garage door is only one possibility for the pattern which was present. He did not believe the clothes found in the dryer had been washed. He also opined Tania had not sustained multiple blows to the mouth area, or that it could be determined by examining the garage door that a beating had occurred. JT 2217-19. Dr. Thomas Bennett performed an independent autopsy on Tania Aesoph. JT 2467. He disagreed with Dr. Randall's assessment of two skull fractures. Dr. Bennett saw only one skull fracture. JT 2477. Dr. Bennett assessed the following injuries: patterned injuries across the left cheek, the left side of the head, the right side of the back of the head, and under the chin, a bruise on the collarbone, bruises and scrapes on the elbows and hands and knees and left ankle, a few broken ribs, and a little bit of blood around the left kidney. JT 2483-84. She also had petechial patterns around her face. JT 2484. Bennett stated "in my opinion from everything we have right here, a woman who was reported to be found at the bottom of the steps and the reports I saw from the original interviews were that her head was twisted beneath her. It is consistent in my opinion with a woman who dies from positional or postural asphyxia." *Id.* Dr. Bennett saw no evidence that Tania was beaten to death or that she was beaten at all. JT 2504-2506.

After listening to sixty-six witnesses over the course of nearly three weeks, the jury began deliberating at approximately 5:25 p.m. on Wednesday, October 4, 2000.[7] They returned their verdict at 2:30 p.m. the next day, after taking a break for lunch. JT 2788. The jury convicted David Aesoph of First Degree murder in the death of his wife Tania. JT 2790.

---

[7]Notes contained along with the jury instructions in the original criminal file indicate the jury began deliberating at 5:25 p.m., broke for supper at 6:00 p.m., and broke for the evening at 9:00 p.m. *See also,* JT 2779-80.

## PROCEDURAL HISTORY

On December 14, 1999, a Hyde County grand jury indicted Petitioner for First Degree Murder in violation of SDCL 22-16-4 (*State v. Aesoph, Hyde County, South Dakota, Sixth Judicial Circuit, CR 99-26*). On March 1, 2000, the grand jury issued a superceding indictment charging Petitioner with three counts: First Degree Murder in violation of SDCL 22-16-4 (Count1); Second Degree Murder in violation of SDCL 22-17-7 (Count 2); and First Degree Manslaughter in violation of SDCL 22-16-15(2) (Count 3). A jury trial commenced on September 18, 2000.[8] On October 5, 2000 the jury found Petitioner guilty of First Degree Murder. On November 8, 2000, the Honorable Max Gors, Circuit Court Judge for the Sixth Judicial Circuit, Hyde County, South Dakota, sentenced Petitioner to life imprisonment without parole.

Petitioner's motion for a new trial was denied on March 5, 2001. Petitioner filed his direct appeal on March 16, 2001. Petitioner raised the following issues on direct appeal:

1. Whether Petitioner's statements to investigators on November 18, 1999 were custodial and should have been suppressed?

2. Whether Petitioner sufficiently asserted his Fifth Amendment right to counsel during the November 18 interviews?

3. Whether Petitioner's November 18 statements to investigators were voluntary?

4. Whether the trial court abused its discretion by admitting the expert testimony of Dr. Saami Shaibani?

5. Whether the victim's prior statements should have been excluded as hearsay in violation of the confrontation clause?

6. Whether the method of selection of additional jurors amounted to a violation of procedural due process?

7. Whether the trial court erred in including a jury instruction on concealment?

8. Whether the trial court abused its discretion in denying a motion for a new trial?

9. Whether the trial court abused is discretion in revoking pre-trial bond?

---

[8] The trial was moved to Kennebec (Lyman County) because of pre-trial publicity.

On June 19, 2002 the South Dakota Supreme Court affirmed Petitioner's conviction. (*State of South Dakota v. Aesoph*, 647 N.W.2d 743 (S.D. 2002)). On September 3, 2002, Petitioner filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Civ. No. 02-3013. Judge Kornmann dismissed the action on September 11, 2002, for failure to exhaust state remedies. Petitioner filed another *pro se* federal habeas application on November 16, 2002. *See* Civ. 02-3040. Judge Kornmann dismissed this second federal habeas on January 29, 2003, again for failure to exhaust state remedies. On March 5, 2003, Petitioner signed his state habeas petition. His court-appointed counsel filed an amended state habeas petition on February 20, 2004. Petitioner raised the following issues in his amended state habeas petition:

1. The incarceration of Petitioner is unconstitutional in that Petitioner did not receive a fair and impartial trial as afforded by the United States Constitution due to, among other things, the ineffective assistance of Petitioner's counsel and a deprivation of due process and 4th Amendment, 5th Amendment, and 6th Amendment rights by virtue of an interview and the admission of such therein. Ineffective assistance of Petitioner's counsel is based on the following:

    (a) The testimony of Dr. Shaibani, the State's expert was not credible in that he put forth qualifications that were not accurate and has since been found to be not credible by a judge in Durham, North Carolina. Petitioner's attorney should have checked the credentials of Dr. Shaibani.

    (b) Petitioner's attorney should have made an argument for mistrial for Prosecutorial misconduct when the State failed to provide the defense with the remaining sample of skin found under the deceased's fingernails which did not match Petitioner's DNA.

    (c) Any other acts which may come to light through further research and investigation.

2. The representation provided to Petitioner by his counsel was [other] than that required by an objective standard of reasonableness, and but for the ineffective assistance of Petitioner's counsel there would be no liberty restraint and/or imprisonment. The failure to suppress the statements of Petitioner and the admission of the same against him at trial is error of constitutional dimension, despite the ruling affirming such conduct set forth in *Siers v. Class*, 581 N.W.2d 491 (S.D. 1998). The foregoing constitutes a denial of due process under the Fourth, Fifth, and Sixth Amendments to the United States Constitution and the South Dakota counterparts thereto found at Article VI, Sec. Two of the Constitution of the State of South Dakota.

An evidentiary hearing was held on September 9, 2004. Three witnesses testified at the hearing: Virginia Flick, Saami Shaibani, and Reed Rasmussen. Several exhibits were received into

evidence. On June 19, 2006, Judge Kathleen Trandahl issued a Memorandum Opinion denying the Petition. Judge Trandahl filed Findings of Fact, Conclusions of Law and an Order denying the Writ on September 12, 2006. Judge Trandahl denied Petitioner's Motion for Certificate of Probable Cause on December 8, 2006. Petitioner moved the South Dakota Supreme Court for a Certificate of Probable Cause on December 27, 2006. The State opposed the motion. Both parties briefed the motion. On February 27, 2007, the South Dakota Supreme Court denied Petitioner's Motion for Certificate of Probable Cause.

Petitioner timely filed his federal habeas Petition pursuant to 28 U.S.C. § 2254. Petitioner raises the following issues in his federal Petition:

1.   The trial court erred in determining that the Defendant was not subjected to a custodial interrogation so as to require law enforcement authorities to advise him of his *Miranda* rights.

2.   The trial court erred in failing to suppress statements made by Defendant where law enforcement authorities responded to his inquiries about an attorney by actively dissuading him from seeking counsel.

3.   The trial court erred in ruling that defendant's statements to law enforcement authorities were voluntary.

4.   The trial court erred in allowing Dr. Saami Shaibani to testify regarding one of his opinions when the underlying basis for the opinion had previously been ruled inadmissible.

5.   The trial court erred in allowing the State to present hearsay evidence from Mrs. Aesoph concerning defendant's character.

6.   The trial court erred in the manner it allowed the Sheriff's office to select additional jurors.

7.   The trial court erred in instructing the jury it could consider acts of concealment allegedly committed by defendant as proof of consciousness of guilt.

8.   The trial court erred in denying defendant's motion for a new trial so as to allow defendant to prove that skin from another male had been found under the decedent's fingernails.

9.   The trial court erred in refusing to allow defendant to remain free on bail pending trial so as to assist in trial preparation.

10. The habeas corpus judge erred in her ruling that the memorandum opinion of a circuit judge in another jurisdiction is not a "public record" that the court could take judicial notice of pursuant to SDCL Ch. 19-10 et. seq.[9]

11. That the habeas corpus judge erred in her ruling that the defendant was not denied effective assistance of counsel by his trial lawyers.

The Respondent has filed an Answer to Petitioner's Amended Petitioner in which it requests denial of the Petition without an evidentiary hearing.

## ANALYSIS

A state prisoner who believes he is incarcerated in violation of the Constitution or laws of the United States may file a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The federal courts are constrained, however by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), to exercise only a "limited and deferential review of underlying state court decisions." *Osborne v. Purkett,* 411 F.3d 911, 914 (8th Cir. 2005). A federal court may not grant a writ of habeas corpus unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from the Court's precedent." *Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S.C. 1495, 146 L.Ed.2d 389 (2000). A federal habeas court may not issue the writ merely because it concludes the state court applied the clearly established federal law erroneously or incorrectly. *Id.* at 411, 120 S.C. at 1495. "Rather, that application must also be *unreasonable.*" Id. (emphasis added).

The state court's factual findings are presumed to be correct, and a federal habeas court may not disregard the presumption unless specific statutory exceptions are met. *Thatsaphone v. Weber,* 137 F.3d 1041, 1045 (8th Cir. 1998); 28 U.S.C. § 2254(e). A federal habeas court "may not simply

---

[9]Respondent asserts this issue is not exhausted, rendering Petitioner's Petition a "mixed" Petition. After the Respondent submitted its Answer, however, Petitioner withdrew his Tenth Claim for Relief. *See* Petitioner's Reply to Respondent's Answer (Doc. 34), p. 21.

disagree with the state court's factual determinations. Instead it must conclude that the state court's findings lacked even fair support in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.C. 843, 850, 74 L.Ed.2d 646 (1983).

Finally, the Eighth Circuit has noted federal review of ineffective assistance claims in § 2254 petitions is particularly deferential: "Our review under 28 U.S.C. § 2254 of a state court's application of *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984) is twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." *Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir. 2005) *cert. den.* 126 S.Ct. 2037, 164 L.Ed.2d 794 (2006).

As a general rule, a petitioner seeking a writ of habeas corpus under § 2254 must first exhaust his available state remedies. 28 U.S.C. § 2254(b)(1)(A). The doctrine of exhaustion requires "as a matter of comity, federal courts should not consider a claim in habeas corpus petition until after the state courts have had an opportunity to act." *Mellott v. Purkett*, 63 F.3d 781, 784 (8th Cir. 1995) *quoting, Rose v. Lundy*, 455 U.S. 509, 515, 102 S.Ct. 1198, 1202, 71 L.Ed.2d 379 (1982). "The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992) A strong presumption exists to require a prisoner to exhaust his state remedies, and the exhaustion requirement is waived "only in rare cases where exceptional circumstances of peculiar urgency are shown to exist." *Mellott*, 63 F.3d at 785.

The Petitioner bears the burden to show all available state remedies have been exhausted, or that exceptional circumstances exist which warrant waiver of exhaustion. *Carmichael v. White,* 163 F.3d 1044, 1045 (8th Cir. 1998). The federal courts' review of state courts decisions is limited in another way: "the law of this circuit requires that an applicant for a writ of habeas corpus refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent constitutional issue in state court" before it will evaluate a claim. *Ford v. Norris*, 364 F.3d 916, 919 (8th Cir. 2004) (citations omitted, punctuation altered).

A petitioner's failure to exhaust in the state courts a claim which does not state a federal constitutional claim, cognizable in federal habeas proceedings, does "not deprive a federal district court of the right to entertain other exhausted claims which do have their roots under the federal constitution." *Martin v. Solem*, 801 F.2d 324, 331 (8th Cir. 1986) (citations omitted). *See also Hall v. Iowa*, 705 F.2d 283, 286 (8th Cir. 1983) ("Nonexhausted state claims included in a federal habeas petition and having no constitutional relevance should not deprive a federal district court of the right to entertain other exhausted claims which do have their roots under the federal Constitution.").

A federal court may not adjudicate the merits of a habeas petition which contains both exhausted and unexhausted claims (a "mixed" petition). *Rose v. Lundy*, 455 U.S. 509, 515, 102 S.Ct. 1198, 1202, 71 L.Ed.2d 379 (1982). The AEDPA one year statute of limitations, however, often results in claims which are time-barred after being dismissed without prejudice in federal court for failure to exhaust. A "stay and abeyance" procedure may be appropriate if a petitioner presents a petition "mixed" with exhausted and unexhausted claims. *Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ct. 1528, 1535 (2005). No stay and abeyance is necessary, however, if the unexhausted claims are "plainly meritless." *Id.;* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

As noted by the Respondent, one of Petitioner's current claims has arguably not been exhausted in state court. The Petitioner, however, has withdrawn his non-exhausted claim. Petitioner's claimed grounds for relief as stated in his § 2254 application are discussed below:

**Petitioner's First Ground For Relief: The trial court erred in determining that the Defendant was not subjected to a custodial interrogation so as to require law enforcement authorities to advise him of his *Miranda* rights.**

This issue was decided by the South Dakota Supreme Court on Petitioner's direct appeal. The South Dakota Supreme Court determined law enforcement did not violate Petitioner's Fifth Amendment rights when they repeatedly interviewed him on November 18, 1999 without the benefit of *Miranda* warnings because Petitioner was not in custody during the interviews. The Court determined "the objective circumstances surrounding Aesoph's interrogation were not such that a

reasonable person would believe he was deprived of his right to freedom." *State v. Aesoph*, 647 N.W.2d 743, 750-51 (S.D. 2002).

The facts pertinent to this issue are found in the recorded statements of David Aesoph's November 18, 1999 interviews, the transcripts of those interviews, and the transcript of the motion hearing which was held on May 15, 2000 regarding Aesoph's motion to suppress the statements.[10] DCI Agents Brian Zeeb, Michael Braley and Jerry Lindberg were present during the three interviews. David Aesoph was interviewed at the kitchen table of his own home. The three interviews totaled about two hours, although they occurred over the span of approximately six hours.

Agent Braley explained that the beginning of the conversation with David is not recorded because Brian Zeeb was at the time still setting up the tape recorder. Before the recorder was activated Lindberg told David the agents needed to speak with him, but he did have to speak with them if he did not want to. MT 54, 157. The first interview began shortly after the agents arrived, at approximately 5:25 or 5:30 p.m. and lasted for thirteen minutes. The second interview began fifteen or twenty minutes after the conclusion of the first, or at approximately 6:00 p.m., and lasted approximately thirty minutes. The final interview began at approximately 10:00 p.m. and concluded at 11:15 p.m. Braley described the first interview as "conversational, inquisitive." MT at 58. He described David Aesoph as a fifty-three year old educated, articulate man. Braley was wearing a firearm, but it was not exposed unless he removed his suit jacket. MT 147.

After the first interview, Braley left the kitchen table to go to the basement to examine Tania's body and confer with the crime scene analysts. Lindberg stayed upstairs between interviews and made conversation with David Aesoph. Lindberg testified that during the times he was not being interviewed by Braley, Aesoph was free to move about upstairs and that he made coffee, talked on the phone, and showed Lindberg around the farm, including the machine shed outside. MT 159, 161. David was calm and unemotional. MT 160. Lindberg offered to sit and visit with David

---

[10]The tapes were marked as trial EX 60A through 60D. The transcript of the interviews was marked as EX 59. The transcribed motion hearing will be referred to as MT followed by the appropriate page number.

while Braley consulted with the crime scene investigators, and David indicated he didn't mind having someone to talk with. MT 61. Trial EX 59, p. 11.

Before beginning the third interview, Braley asked David to move the conversation to the Sheriff's office in order to minimize interruptions and distractions. MT 68. Braley phrased the request in such a way as to describe it as a chance to discuss the situation over a cup of coffee in a more calm, quiet setting. David declined. He told Braley he was perfectly comfortable in his own home and wanted to remain there; Braley acquiesced. MT 68-69.

The third interview was more confrontational than the first two. The phone can be heard ringing on the tapes, but Braley instructs Zeeb to answer it; telling the callers (a neighbor and one of David's daughters) that David will call them back. During the suppression hearing, Braley explained he told Zeeb to answer the phone during the times David was being interviewed because he wished to prevent interruptions. MT 73.

David Aesoph did not admit killing his wife during the course of the three interviews. He was arrested shortly after the conclusion of the third interview at approximately midnight on November 18, 1999.

Two discrete inquiries are essential to the "in custody" determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.3d 383 (1995). This court may grant Petitioner's writ if the South Dakota Supreme Court identified the above governing legal principle correctly but unreasonably applied it to the facts of his case. *Evans v. Rogerson*, 223 F.3d 869, 872 (8th Cir. 2000). The South Dakota Supreme Court accurately recited the facts and correctly identified the governing legal principle defining the custody issue. *State v. Aesoph*, 647 N.W.2d at 751. As in *Evans*, "[a]pplying *Miranda* to an interview occurring in a suspect's own home–at least in the absence of coercion or of a significant deprivation of the suspect's freedom of movement–would cut *Miranda* completely loose from its own explicitly stated rationale." *Id.*

22

(citations omitted). In this case, as in *Evans*, Mr. Aesoph "continued about his domestic activities while in police company. . ." He moved about his home, talked on the phone,[11] and showed Agent Lindberg around his farm. He made coffee for the officers. Although he was not explicitly advised at the beginning of the interview that he was free to leave, he was informed he did not have to speak with the officers. In this case it is especially significant that when David was "invited" to accompany Braley to the Sheriff's office to continue the conversation at the beginning of the third interview, David refused the invitation. Braley acquiesced and David was not forced to go to the Sheriff's office to continue the interview. Under those circumstances, no reasonable person would have believed he had been arrested or that his freedom of movement had been restrained to the degree associated with a formal arrest. *See also, United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002); *United States v. Sutera*, 933 F.2d 641, 647 (8th Cir. 1991) (when a person is "on his own turf" it is not the type of coercive setting normally associated with custodial interrogation). The South Dakota Supreme Court's factual findings find fair support in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's First Ground for Relief be Denied.

**Petitioner's Second Ground For Relief: The trial court erred in failing to suppress statements made by Defendant where law enforcement authorities responded to his inquiries about an attorney by actively dissuading him from seeking counsel.**

This issue was decided by the South Dakota Supreme Court on Petitioner's direct appeal. The South Dakota Supreme Court determined Aesoph's references to an attorney were equivocal and not sufficient to invoke any right to counsel which may have existed had the interviews been custodial, and that "there is no constitutional right to an attorney when the interrogation is non-custodial." *State v. Aesoph*, 647 N.W.2d 743, 752 (S.D. 2002).

---

[11]Lindberg explained David talked to several people on the phone in between the three interviews. It is acknowledged that in an effort to minimize interruptions, Agent Braley precluded phone conversations *during* the interviews. That, however, does not render the interviews custodial. *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004)(explaining why prohibition on access to phone does not render interview custodial).

23

David made several references to an attorney during the third interview. He asserts that because the agents "actively dissuaded" him from asserting his right to counsel during the second and especially the third interview, the state courts erred by failing to suppress his statements.

"[W]e held in *Miranda v. Arizona* 384 U.S. 436, 469-473, 86 S.Ct. 1602, 1625-1627, 16 L.Ed.2d 694 (1966), that a suspect subject to **custodial** interrogation has the right to consult with an attorney and to have counsel present during questioning, and that police must explain this right to him before questioning begins. . ." *Davis v. U.S.* , 512 U.S. 452, 457, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994) (emphasis added). *See also, United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("it is well established, however, that the Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody."); *Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir. 1990 (same). Because the South Dakota Supreme Court correctly found David was not in custody, therefore, it also correctly found he had no constitutional right to the presence of counsel during the November 18, 1999 interviews.

Likewise, the South Dakota Supreme Court found that any request for counsel made during the November 18 interviews was equivocal in any event. If an accused expresses his desire to deal with law enforcement only through counsel, he cannot be subjected to further interrogation until a lawyer has been made available unless the suspect himself initiates further communication with law enforcement. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "Invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of any attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994)(citation omitted).

> A suspect must unambiguously request counsel and if he does not articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney . . . *Edwards* does not require that the officers stop questioning the suspect.
>
> \*\*\*
>
> Supreme Court precedent does not require the cessation of questioning if a suspect makes a reference to any attorney that is ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel.

*Dormire v. Wilkinson* 249 F.3d 804 (8th Cir. 2001) (citations omitted). Also, if the reference to an attorney is ambiguous, it is *good* but not *required* practice for the police to ask questions to clarify whether the suspect does want an attorney present. *Id.* at fn. 2.

If, however, a suspect unambiguously requests counsel at any time before or during an interview, he is not subject to further questioning until counsel has been made available to him unless he initiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "This rigid prophylactic rule is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *United States v. Smith*, 2008 WL 650450 (internal punctuation altered) *(citing, Michigan v. Harvey*, 494 U.S. 344, 350 (1990). "Thus, a suspect who has invoked his right to counsel cannot be questioned regarding any offense unless any attorney is actually present." *Id.* When a suspect has requested counsel during a custodial interview a valid waiver of that right " cannot be established by showing only that he responded to further police-initiated interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

In *Dormire* the suspect said "could I call my lawyer?" That statement was an ambiguous request for counsel. The statements were not suppressed. In *Smith*, the suspect said "can I get a lawyer here?" That statement was an unambiguous request for counsel. The statements were suppressed. *See also, United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003) (suspect's inquiry to agent "do you know any good lawyers?" insufficient to constitute unambiguous request for counsel). The South Dakota Supreme Court acknowledged David's references to counsel during the interviews:

- "If you are accusing me here, maybe I should call my lawyer."
- "Don't you think I should talk to the attorney, ya know?"
- "You're makin sense, Mike. I'm just. I'm afraid to admit to anything. Maybe I should have an attorney. I'm scared to death.

- "I really should call Jeff my attorney. I don't know. I really can't. I maybe can add a little bit to it, but I just, I can't."

The Court found these references insufficient to constitute an unambiguous request for counsel. It noted David's trial admission that "he should have been more adamant in requesting an attorney" and held he was "not denied his right to counsel." *State v. Aesoph*, 647 N.W.2d at 753. The South Dakota Supreme Court's factual findings find fair support in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Second Ground for Relief be Denied.

### Petitioner's Third Ground For Relief: The trial court erred in ruling that defendant's statements to law enforcement authorities were voluntary.

This issue was decided by the South Dakota Supreme Court on Petitioner's direct appeal. The South Dakota Supreme Court noted "[i]ncriminating statements are involuntary if, in light of the totality of the circumstances, the will of the defendant has been overborne by law enforcement." *State v. Aesoph*, 647 N.W.2d at 753. The Court determined "the facts of this case establish that Aesoph willingly participated and fully cooperated in all three interviews." *Id.* The court relied upon the tape recorded interviews to discern the factual setting. *Id.* at 754.

The Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined . . .'" *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct 1612, 1617, 48 L.Ed.2d 1 (1976)(citations omitted). In order to prevail on this claim, Petitioner has the burden of proving he made the November 18 statements only "after [his] will was overborne and [his] capacity to for self-determination was critically impaired." *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993) (citations omitted, punctuation altered). "A statement is not constitutionally involuntary unless the police extorted it from the accused by means of coercive activity." *Id.* The *Jenner* Court emphasized that "numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be

overborne." *Id.* at 334. "There is nothing inherently wrong with efforts to create a favorable climate for confession." *Id.*

The South Dakota Supreme Court observed David Aesoph to be a confident, strong willed man who was fifty-three years old at the time of the interview. The agents testified that his demeanor did not change throughout the six hours they spent with him. MT 165. The Court noted "there is no evidence that Aesoph was so overcome by fatigue or stress as to prevent a voluntary statement." *State v. Aesoph*, 647 N.W.2d at 754. The police tactics in *Simmons v. Bowersox*, 235 F.3d 1124 (8th Cir. 2001), were much more coercive than anything presented in this case,[12] and the Court found the statement was nonetheless voluntary. There is no support in the record to conclude the officers acted in an unacceptably threatening, coercive or overreaching manner. At most, they were persistent. The South Dakota Supreme Court's factual findings are fairly supported in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Third Ground for Relief be Denied.

**Petitioner's Fourth Ground For Relief: The trial court erred in allowing Dr. Saami Shaibani to testify regarding one of his opinions when the underlying basis for the opinion had previously been ruled inadmissible.**

This issue was decided by the South Dakota Supreme Court on Petitioner's direct Appeal. The South Dakota Supreme Court cited SDCL § 19-15-2 (the general equivalent of Fed. R. Evid. 702) and the trial court's "broad discretion" concerning the admission of expert testimony in affirming the admission of the evidence. *State v. Aesoph*, 647 N.W.2d at 754-55.

The crux of David Aesoph's argument is that Shaibani's testimony lacked foundation because it was based upon a diagram drawn by Agent Braley. The diagram was made from Aesoph's description of how he found Tania's body—a description which was rather vague and which changed

---

[12]In *Simmons,* the suspect was only seventeen years old, was a poor student of below average intelligence, was interrogated by three police officers for over two hours, the officers were in close proximity to him and raised their voices at him, misrepresented to him that his accomplice was confessing, told him he was facing the death penalty, and told him "things would go better for him" if he told the truth.

throughout the course of the interviews. The South Dakota Supreme Court rejected the argument and upheld the admission of Shaibani's expert testimony because "he based his opinion on his experience, forensic findings, physical evidence, autopsy reports, and his own observations of the scene .. " *Id.* at 755. These factual findings find fair support in the record. *See* JT at 2098-2115. The Court also acknowledged the trial court's *Daubert*[13] analysis which concluded Shaibani was qualified, the science of accident reconstruction was reliable, standardized, subject to peer review and widely accepted, and Shaibani's opinion was relevant to show how Tania died and whether her death was the result of an accident. *Id.*

A habeas petitioner must show that a state court evidentiary ruling violated his due process rights in order to be entitled to federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 70, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991). A federal habeas corpus court may grant relief based on a state court's evidentiary ruling only if the "petitioner shows that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair. To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial–i.e., that absent the alleged impropriety the verdict probably would have been different." *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995) (punctuation altered, citations omitted). In other words, the Petitioner must show the error resulted in a denial of his due process rights. *Wood v. Lockhart,* 809 F.2d 457, 460 (8th Cir. 1987). Aesoph did not raise nor prove error which rose to the level of a due process violation during the state court proceedings. Additionally, for the reasons which will be discussed in Petitioner's Eleventh Ground For Relief, even if he had sufficiently raised the constitutional issue, Aesoph has failed to show sufficient prejudice in the admission of Shaibani's testimony to succeed here. The South Dakota Supreme Court's factual findings are fairly supported in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Fourth Ground for Relief be Denied.

---

[13]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**Petitioner's Fifth Ground For Relief: The trial court erred in allowing the State to present hearsay evidence from Mrs. Aesoph concerning defendant's character.**

This issue was decided by the South Dakota Supreme Court on Petitioner's direct appeal. The issue was framed and decided at the state court level as whether the admission of the statements violated Petitioner's Sixth Amendment right to confront witnesses against him.[14] The South Dakota Supreme Court affirmed the trial court's admission of Tania's statements pursuant to various exceptions to the hearsay rule, and rejected David Aesoph's Sixth Amendment claim. *State v. Aesoph*, 647 N.W.2d at 757.

The statements which were admitted at trial were statements made by Tania to her children, sister-in-law, priest, close friends, co-workers and a state DCI Agent (1) that she was afraid David would kill her; (2) that if he killed her he would make her death look like an accident; (3) that she felt threatened by David; and (4) that David verbally abused her and shoved her around. *Id.* at 756. If admission of these statements does not constitute a violation of the Sixth Amendment Confrontation Clause, they are evaluated under the same standard as other state court evidentiary rulings: "admission of [a] hearsay statement was violative of [Aesoph's] due process rights only if the court's error in admitting the evidence was so obvious that it fatally infected the trial and rendered it fundamentally unfair." *Oliver v. Wood*, 96 F.3d 1106, 1108 (8th Cir. 1996) (citations omitted).

Instructive is the Eighth Circuit habeas case *Evans v. Luebbers,* 371 F.3d 438 (8th Cir. 2004) in which statements of the defendant's deceased wife, whom he was convicted of murdering, were allowed into evidence. The trial court admitted statements of the defendant's wife to various individuals indicating she was afraid of the defendant (i.e., "I'll be like another Nicole Simpson") that the defendant was verbally and physically abusive to her, and that she intended to divorce him. The Eighth Circuit affirmed the district court's finding that these statements were admissible because they "fell within firmly rooted exceptions to the hearsay rule." *Id.* at 444. The Eighth Circuit

---

[14]Although the issue is not clearly framed as a Sixth Amendment issue in Petitioner's § 2254 application, he does assert "their admission by the Court was a violation of the Confrontation Clause of the . . Federal Constitution . ." which is clearly sufficient to state a constitutional claim.

addressed the United States Supreme Court's then recent decision *(Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)), which addressed the admissibility of "testimonial" hearsay and its application to the Sixth Amendment issue. In *Crawford*, the United States Supreme Court held a witness's out-of-court statements that are "testimonial" in nature violate the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross examine. The Court purposely declined to identify an all-inclusive definition of the term "testimonial" but indicated that at a minimum it includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and . . . police interrogations." *Id.* 541 U.S. at 68, 124 S.Ct. at 1354. The Court noted, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 541 U.S. at 51, 124 S.Ct. 1354. The *Evans* Court noted *Crawford's* inapplicability to the deceased wife's statements which were admitted at trial for two reasons: *Crawford's* holding is not retroactive, and statements such as those made by the victim were not "testimonial" thus their admission does not violate the Confrontation Clause. *Evans*, 371 F.3d at 445.

The *Evans* analysis applies in this case as well with one possible exception: Tania's statements to Agent Dan Juhala. With the exception of the statements to Juhala, Tania's statements were not "testimonial" because they were remarks made to acquaintances, not prior testimony or formal statements made to a government officer. With the exception of the Juhala remark, therefore, Tania's statements will be evaluated in the same manner as any other claimed evidentiary error by a state court.

DCI Agent Dan Juhala testified that he spoke with Tania Aesoph in late 1993. Tania contacted and met with Agent Juhala twice and told him that "she had fears that she thought her husband may try to kill her if she tried to divorce from him or that he knew people that would have that done if she tried to leave him." JT 583. Juhala testified Tania told him if anything happened to her, it would look like an accident. *Id.* Agent Juhala also described other unflattering things Tania told him about her relationship with David, such as his need for control and his demand that she account for every penny she spent. Tania refused to take one of Juhala's business cards because she was afraid David would find it. JT 586. Tania denied David had physically abused her, and

30

refused to allow Juhala to meet or talk with David. JT 588-89. Juhala advised Tania to leave the marriage, but Tania was not ready to do so because she was afraid of what would happen. JT 589.

When asked why Tania met with him and shared the information, Juhala said "she wanted us to be aware that this was going on, what her life was like, so in the event that something happened we were already aware of the issues of her relationship with her husband." JT 589. Given that explanation, Juhala's description of Tania's statements arguably fall into the Supreme Court's definition of "testimonial" for purposes of the Confrontation Clause/Sixth Amendment analysis.

In *Middleton v. Roper*, 455 F.3d 858 (8th Cir. 2006) the Eighth Circuit noted that even assuming *Crawford* applied retroactively and a statement admitted at trial violated the Confrontation Clause, "a violation of the Confrontation Clause is subject to harmless error analysis." *Id.* at 857. The Court applies the harmless error standard of review articulated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and

> inquire[s] whether the alleged error is harmless beyond a reasonable doubt. In assessing whether it appears beyond a reasonable doubt the complained-of error did not contribute to the verdict obtained, we consider the importance of the witness's testimony to the entire case, whether the testimony was cumulative, whether corroborating or contradicting evidence existed, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. . .

*Middleton*, 455 F.3d at 857 (citations omitted). Assuming the admission of Juhala's testimony violated Aesoph's Sixth Amendment rights under Confrontation Clause, the error was harmless. Juhala was one of sixty-six witnesses who testified, he was cross-examined by defense counsel, and several other witnesses corroborated the information he provided. Some of the witnesses (Mike Newton and Carol Baloun, for example) indicated that David (in addition to Tania) indicated David intended to kill Tania in the event she tried to divorce him. JT 686, 934. This evidence, in addition to David's conflicting accounts of the events of November 18, combined with the physical evidence, and the life insurance evidence, leads to the conclusion that "[t]he overwhelming evidence against [Petitioner], as well as the aforementioned considerations, satisfy [the Court] any error was harmless beyond reasonable doubt . . ." *Id.*

The remaining, non-testimonial statements are reviewed according to the standard applied to other claimed evidentiary trial errors. Their admission may serve as a basis for habeas relief only

31

if "the court's error in admitting the evidence was so obvious that it fatally infected the trial and rendered it fundamentally unfair." *Oliver v. Wood,* 96 F.3d 1106, 1108 (8th Cir. 1996) (citations omitted). The South Dakota Supreme Court determined the statements were properly admitted under South Dakota's rules of evidence which define exceptions to the hearsay rule (SDCL 19-16-6), the excited utterance exception, (SDCL 19-16-7) the state of mind exception, and (SDCL 19-16-35), the residual exception. The South Dakota Supreme Court found these statements were properly admitted because they fit within firmly rooted exceptions to the hearsay rule; because a murder victim's statements regarding fear of the accused are admissible to rebut a defendant's claim of accidental death, and because the trial judge instructed the jury to consider the statements only for the purpose of ascertaining whether Tania's death was an accident and not whether David Aesoph was guilty. *See, State v. Aesoph,* 647 N.W.2d at 757. The Court has thoroughly reviewed the transcript of the jury trial. The admission of Tania's statements to her priest, her friends and her co-workers did not violate Aesoph's due process rights because Aesoph has not shown the admission of the statements was "an error [that was] was so obvious that it fatally infected the trial and rendered it fundamentally unfair." *Oliver v. Wood,* 96 F.3d 1106, 1108 (8th Cir. 1996) (citations omitted); *Evans v. Luebbers,* 371 F.3d 438 (8th Cir. 2004) . The South Dakota Supreme Court's factual findings are fairly supported in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Fifth Ground for Relief be Denied.

### Petitioner's Sixth Ground For Relief: The trial court erred in the manner it allowed the Sheriff's office to select additional jurors.

This issue was decided by the South Dakota Supreme Court on Petitioner's direct Appeal (*State v. Aesoph,* 647 N.W.2d at 757-58). The Supreme Court cited SDCL § 16-13-10.2[15] and determined Aesoph did not meet his burden to prove his constitutional due process rights were violated by the manner in which extra jurors were selected when the original jury pool was depleted.

---

[15]SDCL § 16-13-10.2 provides: No citizen shall be excluded from service as a grand or petit juror in the courts of this state on account of race, color, religion, sex, national origin or economic status.

The basis of Aesoph's claim is that the Sheriff's method of recruiting additional jurors excluded Native Americans and "resulted in the exclusion of potential jurors because of race and was not a random selection of jurors as required for a fair trial." The South Dakota Supreme Court noted that to prevail on his due process claim, Aesoph bears the burden to show he was denied a fair and impartial jury by a flawed jury selection. In order to make such a showing, Aesoph must show: (1) the group excluded is a "distinct" group in the community; (2) the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; (3) this under-representation is due to the systematic exclusion of the group from the jury selection process. *Id.* at 757. The Court noted that when the Lyman County Sheriff was requested to recruit additional jurors, the first group of new recruits (twenty additional potential jurors) did not include any people from Lower Brule. The Sheriff explained he did not call anyone from Lower Brule because of the large number of Lower Brule residents from the original potential petit jurors pool did not report. *Id.* at 758.[16] When instructed, he recruited Lower Brule residents for the following day's prospective juror pool. *Id.* Three jurors from that group actually served on the panel. *Id.* Aesoph did not offer any further objections and did not submit any statistical evidence for the appeal or habeas record regarding the percentage of Lyman County citizens who are *eligible* to be petit jurors[17] who are Native American compared to the percentage who were ultimately *called* as potential petit jurors or who *served* as petit jurors in his criminal case.

The Sixth Amendment guarantees a criminal jury composed of a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Wharton-El v. Nix*, 38 F.3d 372, 376 (8th Cir. 1994). Aesoph must establish the following to establish a violation

---

[16]The Supreme Court noted the number of no-shows from Lower Brule to be fifteen.

[17]Pursuant to SDCL 16-13-4.1, the jury selection list "shall consist of the current voter registration list . . .supplemented by the list of persons eighteen of age and over holding a valid driver's license . . . The state court administrator's office shall annually merge these lists . . . to create an accurate jury selection list for preparing the master jury list in each county . . ." SDCL § 16-13-10 defines an eligible voter as "[a]ny citizen of this state, who is a resident of the county or jury district where the jury is selected, eighteen years or older . . . of sound mind and who is able to read, write, and understand the English language... [except]...[a]ny person who has been convicted of a felony unless restored to civil rights is not eligible to serve as a juror. No person may be excluded from jury duty because of a visual or hearing impairment."

of his Sixth Amendment guarantee to a jury composed of a fair cross section of the community: (1) that Native Americans are a distinctive group in the community; (2) that the representation of Native Americans in jury pools is not fair and reasonable in relation to the number of Native Americans in the community; and (3) that this under representation is due to systematic exclusion of Native Americans in the jury selection process. *Wharton-El* at 376. Aesoph has made none of these showings. In *Wharton-El*, the Petitioner had "simply shown that no African Americans sat on his jury." *Id.* Aesoph has made no such showing; the South Dakota Supreme Court noted that at least one juror and one alternate on Aesoph's jury were presumably Native American because they had Native American surnames.[18] Absent something other than a bare allegation his jury did not represent a fair cross section of the community, the Court "cannot conclude that a systematic exclusion occurred or that [Aesoph's] Sixth Amendment right to an impartial jury was violated." *Id.* The South Dakota Supreme Court's factual findings are fairly supported in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Sixth Ground for Relief be Denied.

### Petitioner's Seventh Ground For Relief: The trial court erred in instructing the jury it could consider acts of concealment allegedly committed by defendant as proof of consciousness of guilt.

This issue was decided by the South Dakota Supreme Court on Petitioner's direct Appeal (*State v. Aesoph*, 647 N.W.2d at 758-59). The Supreme Court affirmed the trial court's decision to give the following jury instruction:

Concealment by the defendant, after the events charged in the Indictment, does not create a presumption of guilt. You may consider evidence of concealment, however, as tending to prove the defendant's consciousness of guilt. You are not required to do so. You may consider and weigh evidence of concealment by the defendant in connection with all the other evidence.

The proper formulation of jury instructions primarily concerns the application and interpretation of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Habeas corpus relief may be granted only "when an erroneous jury instruction constituted a fundamental defect that resulted in a complete miscarriage of justice or an omission

---

[18]The Respondent noted in its brief that the petit juror's name was Eagle Thunder; the alternate was Middletent.

inconsistent with rudimentary demands of a fair trial." *Louisell v. Director, Iowa Dept. Of Corrections*, 178 F.3d 1019, 1022 (8th Cir. 1999) (punctuation altered, citations omitted). In a habeas proceeding, the petitioner must show that there is a "reasonable probability" that but for the alleged mistake the result of the proceeding would have been different. *Becht v. Untied States*, 403 F.3d 541, 549-50 (8th Cir. 2005).

The South Dakota Supreme Court noted Aesoph "has the burden to show not only that the instruction given was in error, but also that it was prejudicial error to the effect that under the evidence the jury might and probably would have returned a different verdict if the [instruction] had not been given." *State v.* Aesoph, 647 N.W.2d at 759 (citations omitted). The Court reasoned that although Aesoph did not attempt to conceal Tania's body, the evidence justified a concealment instruction because he attempted to conceal the *crime*. The Court recited the following facts in support of its conclusion there was "ample" evidence indicating Aesoph killed Tania in the garage and moved her body downstairs, where he covered her with a blanket.

- a clump of hair matching Tania's was found under the car in the garage;
- blood spatters matching Tania's were found on the bottom inside panel of the garage door;
- scuffmarks were found on the garage floor;
- the garage floor appeared as if it had recently been cleaned;
- David claimed Tania sustained her injuries in a fall down the carpeted stairs, but no blood was found anywhere on the stairs, the railing, or the walls running down the stairwell;
- David admitted at trial he lied to the law enforcement agents about who had started the washing machine and dryer containing his work clothes, which were running when law enforcement arrived;
- David also admitted at trial he and Tania had fought in the garage before Tania allegedly fell down the stairs;

The Court has carefully reviewed the trial transcript and the complete set of instructions which were read to the jury. Having done so I am not persuaded the concealment instruction constituted a fundamental defect that resulted in a complete miscarriage of justice or that there is a "reasonable probability" that but for the alleged mistake the result of the proceeding would have been different. The South Dakota Supreme Court's factual findings are fairly supported in the record and it did not unreasonably apply federal law. It is therefore respectfully recommended to the District Court that Petitioner's Seventh Claim for Relief should be DENIED.

**Petitioner's Eighth Ground For Relief: The trial court erred in denying defendant's motion for a new trial so as to allow defendant to prove that skin from another male had been found under the decedent's fingernails.**

This issue was decided by the South Dakota Supreme Court on Petitioner's direct Appeal (*State v. Aesoph*, 647 N.W.2d at 760). The Supreme Court affirmed the trial court's decision to deny Aesoph's motion for a new trial based on his assertion that he was unfairly surprised when the State claimed at trial that the DNA results obtained from particle No. 68 could have been from sweat or saliva instead of skin .[19]

This motion centered around "particle number 68" which was characterized as "skin-like" tissue, found under one of Tania's fingernails. The State sent the particle to its lab for DNA testing. The DNA testing was performed, but in the process the sample was destroyed and therefore nothing viable remained for histology testing. The DNA test revealed that the sample did not match David Aesoph, nor did it match the several other known samples which were tested. For the first time at trial, the state suggested that "particle No. 68" may have been something other than skin, such as saliva or sweat. Aesoph asserted that the state's failure confirm the tissue was skin, withholding the information from the defense, and the failure to instruct the jury accordingly entitled him to a new trial.

The South Dakota Supreme Court indicated "Aesoph is only entitled to a fair trial, not a perfect one." *State v. Aesoph.* 647 N.W.2d at 760. The Court reasoned that while the state should have notified Aesoph prior to trial that it had not been confirmed the tissue was skin, "this does not constitute grounds for a new trial." *Id.* The Court concluded Aesoph suffered no prejudice. It acknowledged and agreed with the trial court's reasoning regarding the prioritizing of testing the minute tissue particle:

> The decision by the State Forensic Laboratory to send the particle in its entirety for DNA testing, rather than to another lab for histology testing, was reasonable given

---

[19]Aesoph does not assert the state withheld exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). His argument in support of a new trial was that the state's failure to disclose its indecision about whether particle No. 68 was actually skin constituted an irregularity in the proceedings or unfair surprise pursuant to SDCL 15-6-59(a)(1) and (3).

their obligation to exercise discretion in prioritizing the importance of the various objectives that could be obtained from different types of testing.

Moreover, the trial court correctly concluded that the DNA evidence obtained from particle No. 68 was ultimately of much more importance to the defense, because Aesoph was eliminated as a possible source of the tissue. The trial court did not abuse its discretion and thus there is no showing of an irregularity that warrants relief.

*Id.* (punctuation altered). The defense capitalized on the DNA results at trial to suggest someone else was responsible for Tania's death. *See* JT 528-32 (opening statements) 2758-59 (closing arguments); 1836-36, 1868-73, 1885-87, 1916-18, 1920 (examination of witnesses).

Even had the defense been made aware (pre-trial) of the existence of what remained of the tissue sample after DNA testing, the result would not have made a significant difference in the testimony which was heard by the jury. After the remainder of the sample (the "extract") was sent to the defense expert for purposes of the new trial motion, the defense expert (Henry Travers) submitted an affidavit. He indicated no skin was contained in the vial, but because keratin, which is found in the outer layer of skin, remained in the vial, he believed it was "more probable than not" the tissue was in fact skin. There is little difference between that testimony and Rex Riis's testimony which referred to particle No. 68 as "skin-like tissue" (JT 1795) combined with Wendy Magee's testimony–also describing particle No. 68 as "a piece of possible skin tissue from the victim's left hand fingernail cuttings" (JT 1824). Rex Riis referred to the sample as "skin-like tissue" but admitted he could not state with certainty whether the DNA found on the sample resulted from skin, sweat or saliva. Each witness who testified referred to particle No. 68 as "skin-like" in some fashion or another but defense counsel made it abundantly clear to the jury that whatever it was, particle No. 68 did not come from David Aesoph.

"[A litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845,848, 78 L.Ed.2d 663 (1984)(citations omitted, punctuation altered). On habeas review, evidentiary errors (including claims of unfair surprise) "are only relevant to the extent that the presentation or admission of particular proof infringed on a specific constitutional protection or was so prejudicial as to deny due

process." *Henderson v. Norris*, 118 F.3d 1283, 1286 (8th Cir. 1997). Only errors that "fatally infect the entire trial, preventing it from being fundamentally fair" will justify habeas relief. *Id.* If a review of the totality of the facts in the case leads to the conclusion that no due process violation occurred, habeas relief is not warranted. *Id.* A review of the totality of the facts does not lead to the conclusion that a due process violation occurred when the state failed to determine with certainty before trial whether particle No. 68 was in fact skin, and failed to inform the defense of their failure. Deprivation of that knowledge was not prejudicial to Aesoph, because he was still free to (and in fact did) argue to the jury that the substance found beneath Tania's fingernail matched the DNA of a male who was not David Aesoph. The South Dakota Supreme Court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that Petitioner's Eighth Ground for Relief be DENIED.

### Petitioner's Ninth Ground For Relief: The trial court erred in refusing to allow defendant to remain free on bail pending trial so as to assist in trial preparation.

This issue was addressed by the South Dakota Supreme Court on Petitioner's direct appeal. The Court found that because all other issues had been decided unfavorably to the Petitioner, his argument regarding pre-trial bail was moot. *State v. Aesoph*, 647 N.W.2d at 760.

Aesoph's pretrial bail status has no bearing on whether he is currently in custody in violation of the Constitution, laws or treaties of the United States. *Martin v. Solem*, 801 F.2d 324, 331 (8th Cir. 1986). Additionally, the South Dakota Supreme Court correctly held that because Aesoph's conviction was affirmed, his pre-trial bail claim is rendered moot. *See, Murphy v. Hunt*, 455 U.S. 478, 481-82, (1982) (constitutional claims regarding pre-trial bail rendered moot after conviction); *Fassler v. United States*, 858 F.2d 1016, 1018 (5th Cir. 1988) (habeas petition seeking relief from pretrial confinement moot following conviction). The South Dakota Supreme Court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that Petitioner's Ninth Ground for Relief be DENIED.

**Petitioner's Tenth Ground For Relief: The habeas corpus judge erred in her ruling that the memorandum opinion of a circuit judge in another jurisdiction is not a "public record" that the court could take judicial notice of pursuant to SDCL Ch. 19-10 et. seq.[20]**

Judge Kathleen Trandahl (Sixth Judicial Circuit, Hyde County) presided over Aesoph's state habeas proceedings. The issues presented during the state habeas centered on the trial testimony of one of the State's experts (Dr. Shaibani). Specifically, Aesoph contended his trial counsel was ineffective for failing to better investigate Dr. Shaibani's background and credentials before trial in order to minimize his credibility, and thereby the impact of his testimony. In December, 2004, the parties stipulated to the amend the state habeas record to include transcripts of Dr. Shaibani's testimony from proceedings in other jurisdictions. See, *Aesoph v. Weber*, Civ. 03-05 (Sixth Judicial Circuit, Hyde County, South Dakota), Vol. 1 supplement (stipulating to add transcripts from *United States v. Angela O'Brien*, Crim. F7041-00 (Superior Court, District of Columbia) and *State of North Carolina v. Michael Iver Peterson*, 01-CRS-24821 (Durham County, North Carolina). During the pendency of Aesoph's state habeas proceedings, the defendant in the *O'Brien* case moved for a new trial based on very similar assertions to those made by Aesoph in his state habeas petition (i.e. that Shaibani had perjured himself at trial regarding his qualifications as an expert). The judge in the *O'Brien* case (Judge Satterfield) issued a decision on March 23, 2005,[21] which denied the defendant's motion for a new trial in that case. Judge Satterfield concluded the defendant failed to show (1) Dr. Shaibani testified falsely; (2) that the prosecution knew he testified falsely; or (3) that there was a reasonable likelihood that the alleged perjured testimony could have affected the verdict.

Because the O'Brien decision was favorable to the State's position, Judge Trandahl's refusal to take judicial notice of it was favorable to Aesoph. Stated another way, it was in Aesoph's best interest for Judge Trandahl to deny the Respondent's motion for judicial notice because Judge

---

[20]Respondent asserts this issue is not exhausted, rendering Petitioner's Petition a "mixed" Petition.

[21]The prosecution attached a copy of Judge Satterfield's decision to its Motion for Judicial Notice, and it is contained in the state habeas file, *Aesoph v. Weber*, Civ. 03-05 (Sixth Judicial Circuit, Hyde County) Vol. 1.

Satterfield's opinion in the *O'Brien* case was decided in a manner which was unfavorable to Aesoph's position in his habeas proceedings. Judge Trandahl denied the Respondent's request for judicial notice of the *O'Brien* decision. *See* Doc. 25, EX P. Petitioner has indicated in his Reply to Respondent's Answer (Doc. 34) that he wishes to withdraw this unexhausted claim from his § 2254 application. *See*, Doc. 34, p. 21. It is therefore respectfully recommended to the District Court that Petitioner's Tenth Ground for Relief be DENIED as moot.

**Petitioner's Eleventh Ground For Relief: That the habeas corpus judge erred in her ruling that the defendant was not denied effective assistance of counsel by his trial lawyers.**

The sole issue decided by the state habeas court was whether Aesoph's trial lawyers were ineffective for failing to (1) investigate or discover impeachment information about Dr. Shaibani's credentials; or (2) properly cross-examine Dr. Shaibani about his credentials. Judge Kathleen Trandahl, Sixth Judicial Circuit, Hyde County, decided trial counsel was not ineffective, and that Aesoph failed to show any prejudice. *Aesoph v. Weber,* Civ. 03-05, Sixth Judicial Circuit, Hyde County, South Dakota.

To establish an ineffective assistance of counsel claim, Petitioner must (1) establish counsel's representation fell below an objective standard of reasonableness and (2) show the deficient performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984). To demonstrate prejudice, Petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694, 104 S.C. at 2052. The Court must begin by presuming trial counsel was effective, and strategic choices are entitled to great deference. *Boyd v. Minnesota,* 274 F.3d 497, 502 (8th Cir. 2001). Finally, the Eighth Circuit has noted federal review of ineffective assistance claims in § 2254 petitions is particularly deferential: "Our review under 28 U.S.C. § 2254 of a state court's application of *Strickland v. Washington,* 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984) is twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." *Nooner v. Norris,* 402 F.3d 801, 808 (8th Cir. 2005) *cert. den.* 126 S.Ct. 2037, 164 L.Ed.2d 794 (2006).

40

Counsel was appointed for Aesoph and an evidentiary hearing was held to determine the merits of his state habeas claims on September 10, 2004. The Court has carefully read the transcript of those proceedings. Mr. Aesoph's trial counsel, Dr. Saami Shaibani, and Virginia Flick (Associate University Counsel for Temple University) testified at the state habeas hearing. Thirty-nine exhibits were received into evidence–all regarding Shaibani's credentials and affiliation with Temple University. Those exhibits are also contained in the file which has been reviewed by this Court.

Judge Trandahl issued Findings of Fact and Conclusions of Law dated September 6, 2006. *See* Doc. 25, EX S. Judge Trandahl found the following facts from the evidence and testimony presented at the state habeas hearing:

- David and Tania Aesoph were married in 1975 but their marriage deteriorated over time. Tania sought the help of a divorce attorney in 1994 and shared her fears that Aesoph would kill her and make it look like an accident if she divorced him. She conveyed these same fears to her priest, a DCI agent, her sister-in-law, and close friends and co-workers. Finding of Fact No. 2.

- Aesoph also told a number of people he wanted to kill his wife. Despite her problems, Tania decided to return to the farm where she lived with Aesoph (outside of Highmore, South Dakota) and dropped her 1994 plans to divorce. Finding of Fact No. 3.

- By the fall of 1999, Tania, who was by then the 50 year old mother of five children, contacted her attorney again to reinstate the divorce. She moved to an apartment in Faulkton, South Dakota. By then Aesoph had two life insurance policies on Tania, in the amount of 1.7 million dollars, which were payable to Aesoph in the event of her death by accident. On November 12, 1999, Aesoph called his insurance agent and told him about Tania's divorce plans. Aesoph also told the agent "I'm going to kill the bitch [and] you know I can do it." Finding of Fact No. 4.

- On November 18, 1999, Aesoph and Tania met with an attorney to discuss divorce proceedings, and went to the family farm together at about 11:10 a.m. At 3:01 p.m. Aesoph contacted the former Hyde County Sheriff and claimed that Tania had fallen down the basement stairs and was dead. He also called Mike Volek, the Hyde County Sheriff, at 3:16 p.m. and informed him that his wife had accidentally died. Aesoph was subsequently arrested and tried for his wife's murder. Finding of Fact No. 5.

- At trial, Aesoph was represented by two defense attorneys, Jeffrey T. Sveen and Reed A. Rasmussen. The State presented testimony from two pathologists, Dr. Brad Randall and Dr. Maria Alandy, who explained that the cause of Tania's death was manual strangulation and blunt force trauma, rather than by any fall down a flight of carpeted stairs. In particular, Dr. Alandy, who was the prosecution's last rebuttal witness on October 4, 2000, emphasized that

the victim's multiple wounds consisted of: a black left eye, Petechial hemorrhages consistent with strangulation, a bruised voice box, lacerations, defensive-like injuries to the back of the right hand, two skull fractures, and four broken ribs. Dr. Saami Shaibani also testified at the end of the State's case in chief on October 2, 2000, and indicated that it was against the law of physics for Tania to have sustained her fatal injuries from a fall down a carpeted stairway. Aesoph's defense team had a full opportunity to cross-examine the prosecution's experts at trial, including Dr. Shaibani. They also presented the testimony of two defense experts, Dr. Tom Bennett and Peter Barnett, to rebut the prosecution's case. The last expert witness whom the jury heard before beginning its deliberations was not Dr. Shaibani, but Dr. Bennett, the forensic pathologist who testified for the defense in surrebuttal. Finding of Fact No. 6.

- Other independent evidence of Aesoph's guilt existed at trial, because Aesoph admitted during cross examination by the State that he had been involved in an altercation with his wife in the garage shortly before her death. In addition, the physical evidence presented by the prosecution was compelling because: investigators discovered scuff marks on the garage floor; blood matching Tania's on the lower inside panel of the garage door; a clump of hair matching Tania's under a car parked in the garage; and PCR based testimony on a hair root removed from the left sleeve of the work coat found in Aesoph's washing machine matched the DNA profile of the victim. Two of the state's witnesses also testified that PCR-based DNA testing on a tiny skin-like tissue, which had been found with Tania's left-hand fingernail clippings, belonged to an unknown human male and not David Aesoph. The prosecution, however, elicited testimony from Rex Riis that this particle could have come from any number of people or surfaces, because the victim had been a nurse. Aesoph further admitted to law enforcement that he was the only one at their rural home with Tania when she went down the stairs. Finding of Fact No. 7.

- The Court evaluated Aesoph's six part [ineffective assistance] argument based upon two categories, which included (1) whether trial counsel had failed to investigate or discover impeaching evidence regarding Dr. Shaibani's credibility; and (2) whether this defense attorney had failed to properly confront, cross-examine, and impeach Dr. Shaibani regarding his credentials. Finding of Fact No. 13.

- At the September 9, 2004 habeas hearing, three witnesses, Virginia Flick (a lawyer for Temple University), Dr. Shaibani, and Reed Rasmussen refuted Aesoph's claims of error. Rassmussen explained that both he and Jeffrey Sveen had been retained by Aesoph for his 2000 trial. This attorney described how they had "split things up pretty much equally," had he had been responsible for handling the investigation into Dr. Shaibani's cross-examination at trial. Rasmussen was a highly qualified attorney who: (1) had been licensed to practice law in South Dakota since 1979; (2) had been a law clerk for the Honorable Andrew Bogue from 1979 to 1981; (2) had been an Assistant United States Attorney from 1981 to 1986; and (4) had been in private practice since 1986. This attorney also indicated that (1) about 70-75% of his work as an AUSA pertained to criminal law; (2) he prosecuted five or six murder trials; (3) he had defended two first degree murder trials and had represented 50-100 criminal defendants in private practice. Finding of Fact No. 14.

- Aesoph's claim that Shaibani was never affiliated with Temple University and that the position of associate professor did not exist were not supported by the evidence presented during the September 9, 2004 habeas hearing. Flick, who had been Associate University Counsel since October 9, 2002, testified she received a September 25, 2003 Order from a judge in *State of North Carolina v. Michael Iver Peterson*, File No. 01 CRS 24821, which directed her to produce all documents "with Dr. Shaibani as a clinical professor of physics." Flick researched what she could and responded to the North Carolina judge in a letter dated September 27, 2003. Flick was "shocked" when her letter was introduced into evidence in the *Peterson* trial because she believed she was going to be a witness in the proceeding and was still researching the Court's order. She had discovered a July 25, 1995 appointment letter for Dr. Shaibani at Temple University as well as a September 27, 2001 letter written by Dr. Edward Gawlinski, Chairman of the Physics Department, which incorrectly stated that Shaibani had never been a clinical associate professor of physics at Temple University. Finding of Fact No. 15.

- Flick also testified that during the habeas action, her search for information on Dr. Shaibani in response to a 2004 subpoena in Aesoph's post-conviction action was "like looking for a needle in a haystack" because Temple University never had a file on him and some documents "had been misfiled" or could not be located. Flick explained she found additional documents in 2004, which related to Dr. Shaibani's affiliation with Temple University, subsequent to her September, 2003 response in the *Peterson* murder case. Additionally, she indicated Temple University "had first learned in 2001" that Dr. Shaibani was claiming to have an affiliation wit this institution because of a previous subpoena in *United States v. Angela O'Brien*, Crim. No. F-7041-00, which was sent to Temple in that same year. Flick explained Shaibani had a "loose courtesy affiliation" with Conemaugh Memorial Hospital in Johnston, Pennsylvania, where the Temple School of Medicine sent its third and fourth year medical residents for training. The July 25, 1995 appointment letter written by Dr. Carolyn Adams, Dean of Temple University's College of Arts and Sciences, further substantiated that Dr. Shaibani had been a "clinical associate professor in the physics department from September 1, 1995 to August 31, 1998." Finding of Fact No. 16.

- Flick acknowledged that Shaibani's affiliation with Temple University was an unusual situation and a "special request" was accommodated because normally professors at Conemaugh were appointed from Temple University's medical school. Flick emphasized that she met with Gawlinski in preparation for the 2004 Aesoph habeas hearing and reviewed his inaccurate September 27, 2001 letter with him; and had found that Gawlinski remembered receiving Shaibani's status report letters. Flick also indicated Gawlinski put Shaibani's letters in "file 13" (the garbage can) but that he had found one such letter [EX A-11] while searching a 2004 "catch-all type file." Flick confirmed she had a "vague recollection' that the handwritten note to "Mary" at the bottom of habeas EX A-18 which asked for an "honorary title" for Shaibani on a more-or-less permanent basis referred to the person who organized Dean Adams' office in Temple University's "College of Liberal Arts." Finding of Fact No. 17.

- Flick explained that Dr. Kolff, Chairman of the Department of Surgery at Conemaugh Memorial Medical Center, provided her with a document listing Dr. Shaibani as a full-time research fellow and explained "perhaps Dr. Shaibani did not realize that when he stopped producing and our relationship ended, his appointment with Temple ended." Flick explained that despite the fact that Gawlinski received letters from Shaibani informing him of his activities as a "clinical associate professor of physics" after his written appointment had expired, she could not find any letters written by Gawlinski which would have informed Shaibani that his appointment at Temple had ended on August 31, 1998. Flick also explained she had not uncovered any letters written by anyone at Temple University which might have informed Dr. Shaibani that his affiliation with Temple was over in 1998. Finding of Fact No. 18.

- Flick concluded by stating (1) that Temple University had not taken any legal action or informal action against Dr. Shaibani at any point to stop him from using its name; (2) that she could not reconstruct any phone records on Shaibani because of the telecommunication system at Temple; (3) she had not checked Shaibani's record of grants back to 1992 when he had been a principal research fellow at Conemaugh and she did not know what contracts Shaibani might have had in this capacity. Finding of Fact. No. 19.

- Flick's testimony lends credibility to Shaibani's explanation at Aesoph's trial and it was certainly demonstrated that Shaibani was in fact a clinical professor at Temple University from September 1, 1995 through August 31, 1998. Flick's account reinforced Shaibani's position that he received a July 25, 1998 letter from Carolyn Adams, Dean of the College of Arts and Sciences at Temple University, which appointed him as an affiliated faculty member from September 1, 1995 through August 31, 1998, and gave him the title of "Clinical Associate Professor in the Physics Department." Shaibani also described how he kept Temple University informed about his activities by writing status report letters "each year or every other year" to both the dean of the college and the chair of the physics department. Finding of Fact No. 20.

- The only other discrepancy is whether Dr. Shaibani's appointment extended beyond August 31, 1998. Shaibani testified during the September 9, 2004 hearing that he had not received a written extension but had a number of telephone calls with someone in the dean's office who was perhaps "Mary" in July or August of 1998, which led him to understand that Temple University had given the verbal "green light" for a permanent appointment. He also continued "flying the flag" for Temple University after 1998 by publishing articles in periodicals or journals until September 2003, such as in the Conemaugh Medical Journal and Newsweek Magazine, which represented that he was a clinical associate professor at Temple University. Therefore, it was reasonable for Shaibani to believe at the time he testified at Aesoph's trial in September, 2000, that he was still affiliated with Temple University since no one from this institution told him otherwise, either orally or in writing. Finding of Fact No. 21.

- Although Aesoph relies on the 2003 findings in the *Peterson* case, the judge in that case was not presented with all of the evidence presented in this case in the September 2004 habeas

hearing. According to Shaibani's testimony, he was quite convinced his appointment was orally extended and had reason to believe an extension might have been done in an informal manner due to the "loose" nature of his affiliation with Temple University. His belief that he was still affiliated with Temple after August 1998 is supported by the letter he sent to Dr. Gawlinski dated April 2, 1999 [EX 16] in which he updated Gawlinski on his recent publications and "research activities." Notably, at the conclusion of this letter, Dr. Shaibani refers to his participation in the centennial meeting of the American Physical Society in May, 1999; describes how it was a pleasure for him to "fly the flag" there for Temple University; and thanks Gawlinski "for the continued opportunity I have been afforded for this through my position as Clinical Associate Professor in the Department of Physics." This language rebuts any claim that Dr. Shaibani was aware that his position as clinical associate professor in the physics department for Temple University had expired. Based on this information, Shaibani's testimony at Aesoph's trial and habeas hearing does not amount to perjury and this Court accepts it as credible. Finding of Fact No. 22.

- This expert had other expertise besides his capacity as a clinical professor at Temple University during the time of Aesoph's jury trial. The FBI used him as an informal consultant; he worked for the National Institute for Highway Safety; he had multiple degrees in physics from Oxford University; he taught physics at three colleges other than Temple; he had an engineering license in the District of Columbia; he had a medical patent for injury diagnostics; and he had published extensively in the field of injury mechanisms analysis. These facts are undisputed. Finding of Fact No. 24.

- Attorney Rasmussen explained during the habeas hearing his investigation of Dr. Shaibani included an IDEX search on his background prior to trial and that the IDEX search did not raise any red flags. IDEX is a national database that attorneys use for a fee to investigate an expert's background and his previous testimony in other cases. Rasmussen acknowledged he did not call Temple University to check Shaibani's current employment status but explained it is not his common or typical practice to investigate every credential listed in an opposing expert's CV and he is "not aware of anybody that does that on a routine basis." Rasmussen was "more concerned about what [Dr. Shaibani] was going to testify about than trying to run down everything on his CV." Finding of Fact No. 26.

- The Court considers whether Rasmussen adequately investigated Dr. Shaibani given the information that was available at the time of Aesoph's trial. Dr. Shaibani testified credibly that he had continued his practice of sending yearly status-report letters to Temple University after 1998, although he had not received any responses from this institution. Dr. Shaibani provided copies of his April 2, 1999 and May 4, 2000 letter to both Chair Gawlinski and Dean Platosoucas, which were written during the time frame surrounding Aesoph's trial. Shaibani believed his affiliation as a clinical professor of physics at Temple University had continued until he had actually been shown Temple's inconsistent letters during the *Peterson* trial in 2003, or three years after Aesoph's trial. Finding of Fact No. 27.

- Because of the mutual confusion apparent on the part of both Temple University and Dr. Shaibani, Aesoph has not established any deficient performance or due process violations on

45

this record, and he overstates the importance of Shaibani's testimony during his jury trial. Finding of Fact No. 28.

- Rasmussen's first "inkling" of any purported discrepancies about Shaibani's affiliation with Temple University did not occur until Rasmussen was contacted by a paralegal in the *Peterson* case in the fall of 2003. Rasmussen received a letter from the State about that same time likewise advising him of the discrepancies. Finding of Fact No. 29.

- At the time of Aesoph's trial in 2000, there were no transcripts of prior cases in which Shaibani's credentials were questioned to put Rasmussen on notice that further investigation was necessary. Finding of Fact No. 31.

- Rasmussen adequately investigated Dr. Shaibani's credentials, and there were no "red flags" regarding Shaibani's academic or employment history that would have required Rasmussen to further investigate Shaibani's credentials regarding his degrees at Oxford or his position at Temple University. Finding of Fact No. 32.

- Rasmussen did not fail to properly cross-examine Dr. Shaibani regarding his degrees at Oxford or about his relationship with Temple. Rasmussen explained he was "not all concerned frankly about what [Shaibani] claimed he was." Rasmussen explained he did not cross-examine Shaibani at trial about being a "licensed engineer all over the world" because "I thought his opinions were subject to significant attack, and that's really where I focused on." Rasmussen thought Shaibani's opinions "made no sense." Finding of Fact No. 33.

- Rasmussen took Shaibani's deposition before the criminal trial and used the information he learned during the deposition to attempt to exclude Shaibani's testimony via a pre-trial *Daubert* motion. Rasmussen questioned Shaibani during the deposition about Shaibani's credentials at Temple and Virginia Tech. Finding of Fact No. 34.

- Rasmussen employed a defense expert (Bennett) to rebut Shaibani's testimony. Testimony by the State's rebuttal witness (Dr. Alandy) covered the same issue as that portion of Dr. Shaibani's testimony in which he opined Tania's injuries were not consistent with a fall down the stairs. Dr. Randall's testimony also addressed the issue of whether Tania's injuries were consistent with a fall down the stairs. Finding of Fact No. 36.

- Although Rasmussen did not think Shaibani was "that good of a witness" he made an unsuccessful motion to strike his testimony. At trial, Aesoph changed the story which he had told investigators about the position of his wife's body when he found her on November 18, 1999. Finding of Fact No. 37.

- The prosecutor's references to Shaibani during opening statements and closing arguments do not constitute evidence. Shaibani's testimony was not the centerpiece of Aesoph's 2000 trial, considering the State's two other forensic pathologists, and Dr. Bennett, who countered their opinions. Shaibani emphasized he was not a medical doctor or a pathologist. Shaibani conceded he did not know who caused Tania's injuries. Finding of Fact No. 38.

- There was no valid third party perpetrator which would have made Dr. Shaibani's credentials even more important at trial. The defense was not hampered in any way from arguing its position that a tiny skin-like particle found with Tania's fingernail clippings after her death originated from an unknown human male which excluded Aesoph. The jury rejected Aesoph's contradictory story at trial, as well as the defense's phantom third-party perpetrator theory. Rex Riis and Mike Braley testified no blood was found in the stair area, where Tania supposedly fell to her death, thus negating the accidental fall theory. Finding of Fact No. 39.

Judge Trandahl made the following Conclusions of Law (Case citations are omitted):

- The two-pronged test for claims of ineffective assistance of counsel requires a showing (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that such deficiency prejudiced the defendant. Conclusion of Law No. 3.

- A habeas petitioner must demonstrate prejudice before he is entitled to relief on any due process claims. In order for Aesoph to prevail under the above standard he must show that his counsel was ineffective and there is a reasonable probability that, but for counsel's ineffectiveness, the results of the proceedings would have been different. Newly discovered evidence is not a sufficient ground for habeas relief where no deprivation of a constitutionally protected right is involved. Aesoph bears the burden to prove by a preponderance of the evidence that he is entitled to relief. Conclusion of Law No. 4.

- Trial attorneys are presumed to be competent, and strategic decisions are best left to counsel. Criminal defendants are entitled to a fair trial, not a perfect one. The test is whether errors are so serious that a reviewing court questions whether the results of the trial is reliable, and whether confidence exists in the outcome. Conclusion of Law No. 5.

- In evaluating ineffective assistance claims, deference is given to trial counsel's tactical decisions. In reviewing whether counsel acted reasonably counsel's performance is analyzed in light of the circumstances then existing. Neither the result reached nor second guessing with the benefit of hindsight determine reasonableness. An attorney must make a reasonable investigation and must make reasonable decisions to forego particular investigations. A difference in trial tactics does not amount to ineffective assistance of counsel. Conclusion of Law No. 6.

- Aesoph's ineffective assistance claims fall into two categories relating to Dr. Shaibani's testimony: failure to investigate and failure to cross examine. The Court rejects both claims for the following reasons: (1) Rasmussen adequately investigated Dr. Shaibani's credentials at the time of Aesoph's 2000 trial ; and (2) Rasmussen properly impeached Shaibani about his three degrees from Oxford University and about his position at Temple University. Conclusion of Law No. 9.

- The time frame surrounding Aesoph's September 18 through October 5, 2000 trial controls regarding Rasmussen's investigation of Shaibani's credentials. The state disclosed to

Aesoph's trial attorneys on September 29, 2003 a letter indicating that there were purported discrepancies with Shaibani's credentials. The trial judge in the *Peterson* case was not provided with the same information which was provided during Aesoph's habeas hearing. The parties agreed that the prosecutor in the Aesoph case had no knowledge during the trial of inconsistencies with Shaibani's CV, and that the *Peterson* and *O'Brien* cases did not occur until after the Aesoph trial. There was nothing, therefore, at the time of Aesoph's jury trial in 2000 which might have put Rasmussen on notice that further investigation about Shaibani's credentials was necessary. Conclusion of Law No. 10.

- Aesoph failed to demonstrate that Rasmussen's investigation about Shaibani's affiliation with Temple University was deficient or violated Aesoph's due process rights. Mutual confusion existed on the parts of Shaibani and Temple during Aesoph's September 4, 2004 habeas hearing and Aesoph cannot carry his burden in this regard. Aesoph overstates the importance of Shaibani's testimony at trial. Conclusion of Law No. 11.

- Flick and Shaibani both testified Shaibani had an affiliation with Temple from September 1, 1995 through August 31, 1998 as a Clinical Associate Professor in the Physics Department. Dr. Shaibani firmly believed he had a permanent appointment from Temple because of numerous telephone calls in July or August of 1998 which he believed resulted in a verbal approval for a permanent appointment. No one ever communicated to Shaibani his relationship with Temple had ended or took any legal or formal action against him to stop him from using its name. Shaibani continued to publish under the auspices of Temple. Rasmussen's efforts were therefore reasonable. Conclusion of Law No. 12.

- Shaibani's belief he remained affiliated with Temple after August 1998 is supported by the letter he sent to Gawlinski dated April 3, 1999 updating Gawlinski on his research activities. Shaibani's testimony at Aesoph's criminal trial and at the habeas hearing was credible and did not constitute perjury. Conclusion of Law No. 13.

- Dr. Shaibani had four Oxford degrees in formal parlance, but three degrees in everyday parlance. He had other skills and experience at the time of Aesoph's trial including his work for the FBI and National Institute of Highway Safety, teaching duties at three colleges other than Temple, an engineering license in the District of Columbia and a medical patent for injury diagnostics. He had also published extensively in the field of injury mechanism analysis. Therefore, Shaibani's affiliation with Temple University constituted a very minor component in weighing his expertise and competency to render his expert opinion. Conclusion of Law No. 14.

- Rasmussen's investigation of Shaibani included the following: (1) he performed an IDEX search on a national database to check Shaibani's background and testimony in other cases; (2) he arranged a joint stipulation to take Shaibani's deposition before trial; (3) he questioned Shaibani about his CV and credentials both at Temple University and Virginia Tech; (4) he discovered Shaibani was claiming a "loose affiliation" with Temple University and that most of Shaibani's relationship with Temple was in the research domain; and (5) he found out that

Shaibani's research and teaching responsibilities were very limited because of geographic obstacles. Conclusion of Law No. 15.

- Rasmussen's performance was not deficient because he used the information obtained from deposing Dr. Shaibani to attack Shaibani's opinion on how Tania died. From the defense perspective: (1) the fact that Tania's body had been moved after her death was not disputed; (2) there was no foundation for Shaibani's interpretation about how Aesoph found Tania's body and Rasmussen was successful in excluding this portion of Shaibani's testimony; and (3) the defense used its own forensic pathologist, Dr. Bennett, to rebut Shaibani's analysis about whether Tania's injuries were consistent with a fall down the stairs. Conclusion of Law No. 16.

- Rasmussen testified he was not aware of "anybody" who investigated every credential listed on an expert's CV. Rasmussen was unaware of any anomalies regarding Shaibani's affiliation with Temple University until 2003 when he was contacted about the *Peterson* case. Rasmussen therefore adequately investigated Shaibani's credentials at the time of the Aesoph trial. Conclusion of Law No. 17.

- Rasmussen's choices at trial regarding how to impeach Shaibani were sound. He was not concerned about who Shaibani claimed he was because he "thought his opinions were subject to significant attack and that's really where I focused on." Rasmussen thought Shaibani's opinions "made no sense whatsoever based on a number of reasons." Conclusion of Law No. 18.

- Rasmussen's reasonable trial strategy included: (1) using Shaibani's deposition to file a *Daubert* motion to exclude Shaibani's testimony; (2) preventing the State from using EX 83 during Shaibani's testimony, based upon speculation; (3) making a motion to strike Shaibani's testimony on October 3, 2000 on foundational grounds, despite the fact that no red flags had been triggered about Shaibani's credentials; and (4) employing a defense pathologist (Dr. Bennett) to undercut Shaibani's position regarding how Tania died. Conclusion of Law No. 19.

- Shaibani's testimony was not the keystone at trial, given the state's two other forensic pathologists and defense expert, Dr. Bennett, who contradicted their testimony. Rasmussen impeached Shaibani at trial about his lack of medical credentials, and Shaibani admitted he did not know who caused Tania's injuries. Conclusion of Law No. 20.

- Aesoph's defense team had a full opportunity to argue their phantom third-party perpetrator theory at trial. The jury heard and rejected Aesoph's inconsistent stories about how his wife died. No blood was ever found in the staircase where Tania supposedly fell to her death. Conclusion of Law No. 21.

- Aesoph, therefore, failed to show deficient performance, prejudice, or any due process violations. Conclusion of Law No. 22.

The Court has carefully reviewed the supplemental authority submitted by both Mr. Aesoph (*State v. Plude*, 750 N.W.2d 42 (Wisc. 2008)) and that submitted by the Respondent (*O'Brien v. United States*, 962 A.2d 282 (D.C. 2008)). The relevant time frame for determining whether Aesoph's trial counsel was ineffective, however, was the fall of 2000 and immediately prior. *Odem v. Hopkins*, 382 F.3d 846, 851 (8th Cir. 2004) ("the focus when addressing the adequacy of counsel's performance is on evaluating the conduct from counsel's perspective at the time.")(*citing Strickland*).

Judge Trandahl listened to the testimony at the habeas hearing and found that Dr. Shaibani's testimony was credible—thus rendering Rasmussen's failure to further investigate Shaibani's credentials reasonable. Credibility findings by the state court are presumed to be correct . 28 U.S.C. § 2254(e); *McCullough v. Filion*, 378 F.Supp.2d 241, 253 (W.D.N.Y.) 2005) *citing Marshall v. Lonberger*, 459 U.S. 422, 432-35, 103 S.C. 843, 74 L.Ed.2d 646 (1983) (stating, "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). This Court has carefully reviewed Judge Trandahl's findings of fact —including those concerning Shaibani's credibility, and they find fair support in the record.

Perhaps more importantly, "an appellate court need not consider the performance prong if petitioner fails to prove prejudice, and vice versa." *Stokes v. Armontrout*, 851 F.2d 1085, 1092 (8th Cir. 1988). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984). Judge Trandahl found that (even assuming professionally unreasonable performance) Aesoph failed to prove prejudice by Rasmussen's failure to investigate and cross-examine Shaibani about his credentials at trial. Judge Trandahl found Shaibani's testimony was not the keystone at trial, given the state's two other forensic pathologists and defense expert, Dr. Bennett, who contradicted their testimony. Rasmussen impeached Shaibani at trial about his lack of medical credentials, and Shaibani admitted

he did not know who caused Tania's injuries. Conclusion of Law No. 20. After careful review of the entire transcript and the evidence adduced at trial, this Court agrees.

Despite Aesoph's claims to the contrary, this Court is persuaded that even had Reed Rasmussen discovered Saami Shaibani was a complete impostor –an expert witness equivalent of Frank Abagnale–and had Rasmussen succeeded in excluding his testimony from Aesoph's trial altogether, there is not a "reasonable probability that the result of the proceeding would have been different . . .[that is] a probability sufficient to undermine confidence in the outcome." *Odem v. Hopkins*, 382 F.3d 846, 850 (8th Cir. 2004) (citations omitted). Given the overwhelming evidence of Aesoph's guilt, including Aesoph's own contradictory testimony, the physical evidence found at the scene, the life insurance evidence, and the two other medical experts who testified Tania's injuries were inconsistent with an accidental death,[22] Judge Trandahl's finding that Aesoph failed to prove the prejudice prong of the *Strickland* standard for ineffective assistance of counsel is supported by the record. The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that Petitioner's Eleventh Ground for Relief be DENIED.

## RECOMMENDATION

Petitioner's habeas corpus claims were adjudicated on the merits after an evidentiary hearing in state court where he was represented by court-appointed counsel. Petitioner has failed to satisfy his burden of rebutting the presumption of correctness of the state court's adjudication by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state court determination was not contrary to, nor did it involve an unreasonable application of clearly established federal law *(Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)), and was a reasonable determination of the facts in light of the evidence presented in the state habeas proceeding. *See* 28 U.S.C. § 2254(d). The claim which has not been exhausted at the state level may nevertheless be dismissed with prejudice because it has been withdrawn by the Petitioner.

---

[22]In fact, Dr. Alandy (a forensic pathologist and the State's rebuttal witness) used the same word to describe the odds of Tania's injuries having been caused by a fall down the stairs as did Dr. Shaibani—"impossible." JT at 2605.

Petitioner has failed to make a "substantial showing of the denial of a constitutional right." A certificate of appealability should not be issued in Petitioner's case. 28 U.S.C. § 2253(c)(2). Although 28 U.S.C. § 2253(c)(2) has been found to be "only a modest standard," Petitioner has not shown that "the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement or to proceed further.'" *Randolph v. Kemna*, 276 F.3d 401, 403 n.1 (8th Cir. 2002) (citations omitted).

Therefore, it is respectfully RECOMMENDED to the District Court that:

(1)     Respondent's Request to to Dismiss the Petition without an evidentiary hearing (Doc. 25) be GRANTED;

(2)     A Certificate of Appealability should not be issued;

(3)     Petitioner's Application for Writ of Habeas Corpus and Amended Application for Writ of Habeas Corpus (Doc. 1 and Doc. 13) be DISMISSED with prejudice.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)

Dated this **11** day of February, 2010.

BY THE COURT:

_John E. Simko_
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, CLERK
by _Jumma Wah_ Deputy
(SEAL)